City of Pittsburgh, Appellant, *v.* Pennsylvania Public Utility Commission.

188

190

Argued March 11, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*J. Alfred Wilner* and *Anne X. Alpern,* City Solicitor, for City of Pittsburgh.

*R. C. Orr,* with him *Harold F. Reed* and *Reed, Ewing & Ray,* for St. Joseph Lead Company of Pennsylvania.

*Robert H. Griswold,* with him *McNees, Wallace & Nurick,* for Crucible Steel Company of America.

*Thomas J. Munsch, Jr.,* and *Charles E. Kenworthey,* with them *C. K. Robinson* and *David Dunlap,* for Duquesne Light Company.

*John E. Fullerton,* Assistant Counsel and *Lloyd S. Benjamin,* Acting Counsel, with them *William J. Grove,* for Pennsylvania Public Utility Commission.

OPINION BY RHODES, P. J., July 17, 1952:

This is a rate case which had its inception on February 6, 1950, when Duquesne Light Company filed a new tariff (No. 10) with the Pennsylvania Public Utility Commission. The effective date was to be April 10, 1950. It was estimated that the effect of the proposed tariff would be an increase in annual revenue of $7,720,612. Complaints against the proposed tariff were filed by the City of Pittsburgh, Borough of Oakmont, City of McKeesport, City of Clarion, Vanadium Corporation of America, Universal-Cyclops Steel Corporation, St. Joseph Lead Company, and Crucible Steel Company of America. Complainants alleged that the proposed rate increases were discriminatory, unreasonable, and unlawful, and they asked that the new rates be suspended pending final action by the Commission.

On April 3, 1950, the Commission initiated an investigation on its own motion for the purpose of determining the fairness, reasonableness, justness, and lawfulness of the rates and charges of Duquesne under the tariff filed February 6, 1950. At the same time, the

Commission by its order suspended the operation of the proposed tariff for a period of six months, or to October 10, 1950. On October 2, 1950, the Commission again postponed the effective date of the said tariff for a period of three months, or until January 10, 1951. On that date the new rates under tariff No. 10 became effective by operation of law. All of the complaints were consolidated for the purpose of hearing. Hearings were held by the Commission between May 10, 1950, and December 8, 1950; and the transcript totaled 3,380 pages. Thereafter, on December 13 and 16, 1950, petitions were filed by the City of Pittsburgh and the industrial complainants (hereinafter called Industries) requesting that the existing rates of Duquesne be prescribed by the Commission as temporary rates. The Commission, by order of January 8, 1951, denied the prayer of the petitions, two commissioners dissenting.

In its final order of August 29, 1951, the Commission found that the rates in tariff No. 10 were unjust, unreasonable, and unlawful, and disallowed the proposed increase of $7,720,612. The Commission found, however, that Duquesne was entitled to an increase of $3,556,924, and ordered the utility to file an acceptable tariff which, together with other electric revenues of $675,518, would produce annual operating revenues totaling $60,574,238 based upon the 1949 level of operations. In this order provision was likewise made for refunds. Commissioner Houck filed a dissent in which he concurred with the majority on all questions except that he would direct Duquesne in its new tariff to modify the fuel cost adjustment clause, which was based on a fixed thermal efficiency factor and applied to industrial customers, so as to reflect actual thermal efficiency.

The City of Pittsburgh appealed (No. 179, April Term, 1951) to this Court from the Commission's or-

der. Duquesne appealed (Nos. 1 to 9, inclusive, April Term, 1952) from the order, claiming that the Commission erred in not allowing the full increase under tariff No. 10. St. Joseph Lead Company and Crucible Steel Company of America, the Industries, also appealed (Nos. 10 and 11, April Term, 1952). The City and the Industries contend that the increase which was allowed by the Commission is excessive, and that the rates are discriminatory and unreasonable. The petition of Duquesne for supersedeas was denied by this Court.

In this opinion we shall consider the contentions according to topic or subject matter, and we shall accordingly dispose of the questions raised by the respective parties in all appeals.

RATE BASE—MEASURES OF VALUE: The Commission found the fair value of Duquesne's property, used and useful in the public service, to be $215,000,000 as of December 31, 1949. Duquesne submitted four measures of value as follows: (1) Original cost; (2) original cost trended to spot prices of January 1, 1950; (3) estimated reproduction cost at the spot prices of December 31, 1949; and (4) estimated reproduction cost at the average prices for the three years 1947-1949. Duquesne's depreciated original cost figure, including construction work in progress, was $178,362,927; original cost trended to spot prices of January 1, 1950, undepreciated, was $378,399,253; depreciated reproduction cost based on spot prices as of December 31, 1949, was $311,065,917; depreciated reproduction cost at the average prices for the three years 1947-1949 was $293,469,196. With respect to measures of value, the Commission, after deducting accrued depreciation and depletion, made five findings: Original cost $169,831,025; reproduction cost at spot prices of December 31, 1949, $267,647,769; original cost trended to spot prices of January 1, 1950, $269,154,778; original

cost trended to the three year price level of 1947-1949, $252,779,955; original cost trended to the five year level of 1945-1949, $229,395,523.

The rate base in this Commonwealth is fair value. *Solar Electric Co. v. Pennsylvania Public Utility Commission*, 137 Pa. Superior Ct. 325, 9 A. 2d 447; *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 153 Pa. Superior Ct. 475, 34 A. 2d 375; *Equitable Gas Co. v. Pennsylvania Public Utility Commission*, 160 Pa. Superior Ct. 458, 463, 51 A. 2d 497. The measures of value—that is, the ways in which the elements of value (the various units of a utility's assets) are to be valued—upon which the determination of fair value is to be made have been described by decision and statute in this state. Among the measures of value to be considered are original cost and reproduction cost based upon the fair average price of materials, property and labor. We have said that the Commission is not bound by any formula in fixing the rate base but shall consider all facts which have a relevant bearing on fair value. *Equitable Gas Co. v. Pennsylvania Public Utility Commission*, supra, 160 Pa. Superior Ct. 458, 464, 465, 51 A. 2d 497. The weight to be given any particular measure of value, such as original cost or reproduction cost, is for the Commission, but its action must be within the area of its administrative discretion and supported by the evidence. Original cost is not necessarily fair value, and such cost does not ordinarily represent a proper rate base; and the Commission is not obliged, as the City contends, to give predominant weight to original cost in its finding of fair value. It is argued on this appeal in behalf of Duquesne that the Commission gave undue weight to original cost in its finding of fair value, and failed to give proper weight to reproduction cost which, it is contended, should under present economic conditions

be synonymous with fair value. We reject here, as we did in *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 51 A. 2d 497, the contention that reproduction cost must be given controlling weight by the Commission in rate cases. If the Commission gave more weight to original cost in its finding of fair value than it did to reproduction cost, this would not invalidate such finding. Original cost trended to spot prices of January 1, 1950, and to three and five year price levels and then depreciated was virtually equivalent to reproduction cost depreciated based on similar averages. See *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 469, 51 A. 2d 497. Such difference as there may be between original cost trended and reproduction cost arises principally from the use of piecemeal construction figures and mass production estimates.

In addition to findings of original cost and reproduction cost at spot price level of December 31, 1949, the Commission made three findings on original cost trended: (1) At spot prices of January 1, 1950; (2) to the three year price level of 1947-1949; and (3) to the five year price level of 1945-1949. As likewise submitted by its staff, the Commission had before it original cost trended to the ten year average price level for the period 1940-1949, but it unqualifiedly rejected consideration of any measure of value based on ten year average prices.[1] In so doing the Commission stated: "In the determination of the issues involved in these proceedings, we will give no further consideration to

---

[1] Such trended original cost at the average price level for the ten years, 1940-1949, was $270,830,331. This amount comprised $251,388,196 of depreciable plant, $13,841,770 of depletable plant, and $5,600,365 of nondepreciable plant. The estimated depreciation to be deducted was $105,734,696.

ten-year average prices for the reason that prices have not leveled off onto a plateau, but rather have continued to increase steadily in the past with no foreseeable prospect of decline in the relatively near future. Moreover, the record shows that respondent is serving a highly industrialized area, as a result of which it is faced with a demand for substantial sums of new capital to meet its plant expansion program. Ten-year average prices are, accordingly, not properly usable in this case."

Our law requires that reproduction cost estimates be based upon the "fair average price of materials, property and labor." *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 463, 466, 51 A. 2d 497; *Pittsburgh v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 519, 525, 69 A. 2d 844; *Blue Mountain Telephone & Telegraph Co. v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 320, 67 A. 2d 441; *Pittsburgh v. Pennsylvania Public Utility Commission,* 169 Pa. Superior Ct. 400, 405, 82 A. 2d 515. The obvious purpose of the requirement of "fair average prices" is to avoid the use of the high or the low prices over a given period, and in this way to arrive at a valuation that is fair to all interests, both to the utility and to the consumer or customer. And an average having a broad base will rest on a more solid foundation than a short term average or a cost based on spot prices. In cases involving reproduction cost estimates a five or ten year average has generally been used, and in *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 51 A. 2d 497, as well as in *Blue Mountain Telephone & Telegraph Co. v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 320, 67 A. 2d 441, we upheld the use by the Commission of reproduction cost based on

ten year average prices. In the present proceeding the Commission had before it reproduction cost (or trended original cost) figures based on ten year averages, but refused to consider them because the recent trend of prices had been upward. The reason given by the Commission for rejecting ten year average price estimate was not valid, since it was in direct conflict with the purpose underlying the use of such averages. The weight to be given a reproduction cost figure based on long term averages, in a period of rising or falling prices, is another matter. While the Commission has discretion as to "what formula it shall use in determining fair average prices" (*Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 169 Pa. Superior Ct. 400, 405, 82 A. 2d 515), its findings as to fair average prices must be supported by evidence, and the Commission must not have acted arbitrarily or under an error of law. Naturally, if prices are constant over a given period, spot prices will be the equivalent of the average for that period. Such is not the situation in the present case. The Commission's rejection of ten year average prices and its finding based thereon was arbitrary, and the reason given was erroneous. Under such circumstances the Commission should be given an opportunity to exercise its administrative discretion on all the admissible evidence. Cf. *Securities and Exchange Commission v. Chenery Corporation,* 318 U. S. 80, 94, 63 S. Ct. 454, 87 L. Ed. 626, ibid. 332 U. S. 194, 67 S. Ct. 1575, 91 L. Ed. 1995. We may not substitute our judgment for that of the Commission, but our review is not precluded "where the Commission has arbitrarily ignored material and undisputed evidence, misconstrued the facts or misapplied the law": *Pittsburgh v. Pennsylvania Public Utility Commission (Appeal of Bell),* 370 Pa. 305, 315, 88 A. 2d 59, 64. Under the fair value rule prevailing in this

state, consideration should be given to original cost and *average price* reproduction cost of the property; it was never intended that fair value be the equivalent of market price or cost at current prices. In determining fair value for rate making purposes, i.e., the value fixed at the time the rates are established, the Commission should exercise reasonable judgment on all relevant facts.

COAL LEASEHOLDS IN RATE BASE: In addition to coal lands owned in fee, Duquesne held large tracts under lease purchase agreements. These leases provided for payment for the coal, as mined, on an annual royalty basis. The Commission allowed amounts totaling $3,709,234, representing the total of past and estimated future royalty payments under the lease purchase agreements, to be included in original cost and reproduction cost. In other words, the Commission allowed these annual payments under the coal leases to be capitalized and included in the rate base to the extent of almost four million dollars. Both the City of Pittsburgh and the Industries attack the inclusion in the rate base of the coal to be purchased under the lease agreements. In including this amount in its determination, the Commission relied upon the rule of law in this state that, for some purposes, a lease purchase agreement is in legal effect a sale of the coal in place, vesting a fee to the coal in the purchaser (*Smith v. Glen Alden Coal Co.*, 347 Pa. 290, 32 A. 2d 227).

The Commission was plainly in error in capitalizing these leaseholds and including them in the rate base for public utility valuation purposes. It is clear from the record that the royalty payments under the leases were paid as the coal was mined, or on an annual basis, and were charged by Duquesne as an operating expense under fuel cost. It is well settled that amounts which are charged to operating expenses cannot be capitalized

and included in the rate base. In *Pittsburgh v. Pennsylvania Public Utility Commission,* 158 Pa. Superior Ct. 229, 44 A. 2d 614, we held that items charged off to operating expense, such as the cost of drilling wells, etc., amounting to over four million dollars, could not be considered as additions to capital entering into a finding of fair value. Here, as in the case cited, elimination of so substantial an item as $3,709,234 should reduce the rate base with corresponding benefit to the consumers through downward adjustment of the present tariffs. The Commission and Duquesne contend that coal purchased under the leases is in effect a capital item, the same as a new generator bought on the installment plan under annual payments. This view overlooks the fact that the royalties are charged off annually as an operating expense and hence the coal leaseholds have no substantial value as a capital item. An oil furnace to heat the house of the owner is a capital investment, but the aggregate cost of fuel oil in future years is not ordinarily a capital item, being instead an item of annual expense. It is clearly error to take *future* royalty payments, capitalize them and add them to the rate base, as in reproduction cost, when, as the royalties are paid each year, they must be written off as an expense. No matter what designation is given these future royalty payments, they cannot be treated for utility valuation purposes as a capital item entering into the rate base. They are not value on which the utility is entitled to a fair return, where they are annually charged off to fuel cost as an expense.

COAL LANDS IN RATE BASE: The Commission included in the rate base coal mining properties owned and operated by Duquesne. The utility claimed that ownership of mines was necessary to insure a continuous supply of coal and to strengthen the utility's bar-

gaining position in buying coal on the open market. The City and the Industries both object to inclusion in the rate base of these coal mines, although the City's objection does not apply to original cost. In including the coal mines in the rate base the Commission held that the acquisition of such mines by the utility was justified in order to assure a continuous supply of coal, and that it was not an abuse of managerial discretion. The fact that a utility owns and operates a property or a business does not, in itself, justify its inclusion in the rate base, and the burden is upon the utility to show the property is used and useful in the public service. *Erie City v. Public Service Commission,* 278 Pa. 512, 529, 123 A. 471; *Schuylkill Valley Lines, Inc., v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 393, 398, 399, 68 A. 2d 448. There is undoubtedly a limit to which a utility may engage in mining, manufacturing, or other enterprises not a necessary part of the utility's business on the ground that it is within the discretion of management. The incorporation of such enterprises in the rate base of a utility should be carefully scrutinized. The activities of a utility should be confined to utility functions in the rendition of public service. The inclusion of coal land in the rate base is debatable, but on the present record we think the Commission's action must be sustained as within the area of its administrative discretion. Cf. *Commuters' Committee v. Pennsylvania Public Utility Commission,* 170 Pa. Superior Ct. 596, 88 A. 2d 420; *Pennsylvania Power & Light Co. v. Public Service Commission,* 128 Pa. Superior Ct. 195, 209, 210, 193 A. 427.

EXCLUSION OF SHIPPINGPORT COAL PROPERTY FROM RATE BASE: Duquesne claims the Commission erred in excluding from the rate base a coal property representing an investment of $708,913,

known as the Shippingport Coal Property. This property was purchased in 1933, consisting of 1,900 acres, and is situate on the Ohio River about eighteen miles from the utility's Phillips Power Station. It has not been developed, is not presently in use, nor is there any evidence that it will be used in the near future. The Commission properly excluded this property from the rate base as not presently used or useful in the public service. *Schuylkill Valley Lines, Inc., v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 393, 398, 399, 68 A. 2d 448.

REAL ESTATE APPRAISALS: The City and the Industries attack the Commission's allowance of $5,-169,513 for land, and $1,301,275 for dwellings. The appraisals and valuations made by the real estate appraiser for Duquesne are seriously questioned. The Commission apparently accepted the opinion testimony of Duquesne's expert witness. The appraisals, as accepted by the Commission, tended to inflate the rate base. However, we cannot substitute our judgment for that of the Commission although we would disagree with the values placed upon the properties.

ACQUISITION ADJUSTMENTS: Duquesne owns certain property which had previously been devoted to public use and which it had purchased at a price in excess of the cost when first devoted to public use. Stated differently, a utility buys property from another utility and the buyer pays more than the depreciated original cost to the seller utility. The reasonableness of the purchase as an arm's-length transaction is not questioned. In such cases the Commission's accounting rules require the utility to record in Account 100.1, Electric Plant In Service, the cost of the property as of the time when first devoted to public use. The amount by which the cost to the present owner exceeds the cost when first devoted to public use is recorded

in Account 100.5, Acquisition Adjustments. In the present case, the amount carried in the Acquisition Adjustment Account was $3,760,429. The Commission refused to include the unamortized portion of the above figure, or $2,758,558, in original cost, stating as follows: "In our opinion the excess of an arm's length purchase price over original cost may or may not be indicative of the increment in value at the time of purchase, but it is not properly includable in the original cost measure of value. Accordingly, respondent's claim of $2,758,558 must be disallowed as original cost when first devoted to public service. However, in our determination of fair value, consideration will be given to this amount as representing an additional investment in property made by respondent at arm's length over and above the original cost as found herein." The Commission also disallowed an item of $1,229,350 representing amounts paid to indenture trustees for the acquisition of property acquired from affiliates of the utility. Duquesne argues that original cost as an element of fair value means actual cost to the utility, and not cost of property when first devoted to public use. We find no error of law in this action of the Commission. As this Court stated in *Scranton-Spring Brook Water Service Co. v. Pennsylvania Public Utility Commission*, 165 Pa. Superior Ct. 286, 295, 67 A. 2d 735, 739: "We have no doubt that the term 'original cost' or 'original cost of construction' . . . is equivalent to 'the original cost of such property when first devoted to the public service' under section 502, and that original cost does not mean cost to the present owner as appellant contends. In section 310 (a) of the Public Utility Law of 1937, 66 PS §1150 (a), reference is made to original cost of the physical property of the utility when first devoted to public use. The Public Service Company Law of July 26, 1913, P. L. 1374, §20 (a),

in defining the elements of fair value, included 'the original cost of construction' of the company's property, and such original cost did not include increase in market value due to merger, sale, or consolidation. Cf. Beaver Valley Water Co. v. Public Service Commission, 76 Pa. Superior Ct. 255, 259. Under appellant's view, original cost would be synonymous with book cost or cost to the present owner. Of course this is not necessarily true." In so far as the excess of the purchase price over original cost may have represented a true element of fair value, it was taken into account by the Commission in its fair value determination. Cf. *American Telephone & Telegraph Co. v. United States*, 299 U. S. 232, 240, 57 S. Ct. 170, 174, 81 L. Ed. 142.

ACCRUED DEPRECIATION: The Commission found accrued depreciation and depletion, applicable to original cost, of $58,400,000. Accrued depreciation for reproduction cost at the spot prices of December 31, 1949, was $119,500,000; for original cost trended to spot prices of January 1, 1950, $127,000,000; for original cost trended to the three year average prices of 1947-1949, $118,600,000; and for original cost trended to the five year average prices of 1945-1949, $107,000,000. Duquesne complains that the Commission applied an unduly high rate of accrued depreciation when it found 30 per cent applicable to original cost, and 35 per cent applicable to reproduction cost and trended original cost. The City, on the other hand, contends that the Commission's findings on accrued depreciation were inadequate and not supported by evidence, and that the Commission ignored the accrued depreciation study made by the Commission's own staff. Duquesne claimed $56,234,174, or the book reserve as of December 31, 1949, for accrued depreciation applicable to original cost; $85,852,909 applicable to spot

price reproduction cost as of December 31, 1949; and $80,021,661 applicable to three year average price reproduction cost. The utility's accrued depreciation estimates were based on observed conditions and in part on the competitive service value method. The percentage of its accrued depreciation applicable to spot price reproduction cost was 24.81. The Commission staff submitted estimates of accrued depreciation which were based on information furnished by Duquesne concerning the group average service life of utility property, the net salvage ratio, and the average service life of plant surviving at January 1, 1950. The estimates of the Commission's staff showed $68,422,831 applicable to original cost, or 34.99 per cent of depreciable plant; $144,271,522 applicable to original cost trended to the spot prices of January 1, 1950, or 39.61 per cent of depreciable plant; $121,767,173 applicable to original cost trended to the five year average price level of 1945-1949, or 39.64 per cent of depreciable plant; and $105,734,696 applicable to original cost trended to the ten year average price level of 1940-1949, or 39.70 per cent of depreciable plant. The Commission rejected the utility's accrued depreciation estimates in so far as they were based on book reserve or physical depreciation as being inaccurate and unreliable.

Both the City and Duquesne made accrued depreciation estimates of three generating plants using the "competitive service value method" of estimating the accrued depreciation applicable to spot price reproduction cost. The utility estimate showed an accrued depreciation of 47.3 per cent applicable to the spot price reproduction cost of its three generating stations, whereas the study of the City made on a similar competitive service value method showed depreciation of 76.8 per cent of spot price reproduction cost. The Com-

mission rejected both estimates and criticized the competitive service value method as unfair because it "first determines the value of existing plants and then by the subtraction of that value from the reproduction cost, the total accrued depreciation, applicable thereto, is determined," and because such method involved various subsidiary estimates which were themselves uncertain, making the ultimate result highly conjectural. The Commission was not bound to accept any particular method of estimating accrued depreciation. It reviewed the evidence and pointed to weaknesses in Duquesne's depreciation estimates, and also in those of the City and the utility relating to accrued depreciation on generating plants arrived at by the competitive service value method. Nor was the Commission bound to accept as final the accrued depreciation study of its own staff, but much weight was given to its estimates. There was ample evidence to support the Commission's findings on accrued depreciation, and it cannot be said that its determinations were arbitrary or unreasonable. The weight to be given to any particular estimate of accrued depreciation was for the Commission. The ultimate findings (30 per cent and 35 per cent) with respect to accrued depreciation represent, of necessity, essentially a judgment figure. *Schuylkill Valley Lines, Inc., v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 393, 402, 68 A. 2d 448; *Blue Mountain Telephone & Telegraph Co. v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 320, 326, 67 A. 2d 441.

RATE OF RETURN: Three expert witnesses testified as to the proper rate of return; two on behalf of the utility, and one for the City. The witnesses for the utility advocated a 6.3 per cent rate of return; the City's expert arrived at a figure of 5.3 per cent. The Commission considered the evidence submitted and al-

lowed 6 per cent as a fair rate of return, which, applied to the fair value finding of $215,000,000, resulted in an allowable annual return of $12,900,000. The higher rate of return claimed by the experts for the utility results from their advocacy of (1) a higher proportion of equity (common stock) capital, and (2) inclusion of "embedded costs" or costs of refunding debt securities and replacing preferred stock to take advantage of lower interest rates. The Commission found that a proper rate of return could not be based on an excessive weighting of the common stock component, the most expensive type of capital. The Commission considered the "embedded costs" as part of the historical or experienced cost of capital, and it gave consideration both to historical cost and current cost of capital. The Commission's findings relating to rate of return are supported by substantial evidence, and the record does not disclose any error of law in this respect. The allowable rate of return is a variable depending upon all relevant facts in a particular case. *Schuylkill Valley Lines, Inc., v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 393, 403, 68 A. 2d 448. Duquesne's argument for a rate based on an alleged ideal capital structure was properly rejected by the Commission.

REVENUES AND EXPENSES: The claim of the utility for increased rates was based upon the use of 1949 figures as a test year so far as operating expenses and revenues were concerned. The Commission stated that it used the basic data for the year 1949 in its analysis. However, the Commission made what it considered necessary adjustments to the 1949 revenue and expense figures. The gravamen of the complaint of the City and the Industries is that the Commission adjusted 1949 expenses upward to reflect 1950 wage increases, etc., but did not correspondingly adjust 1949 revenue

figures to reflect a substantial or ten per cent increase in operating revenues, as shown by the utility's report for the year 1950. The City contends that 1949 was not a normal year, and that the Commission failed to consider the effect of a business recession, coal strike and steel strike, during that year. The Commission found the utility's actual operating expenses for 1949, by its books, to be $31,209,895. To this figure the Commission made certain adjustments, both upward and downward, and arrived at a figure of $30,724,995 as allowable operating expenses. Included in the adjustment upward was $957,000 for wage increases granted employes in October, 1949, and October, 1950, and $753,000 covering increased coal costs due to higher miners' wages following the March, 1950, coal strike settlement. The Commission took the view that coal strikes were not a normal or recurring event, and adjusted the utility's generating station fuel expense downward by $577,000. It also further adjusted expenses downward to the extent of $1,783,000 based on savings due to increased efficiency of the new Phillips Unit No. 2 Generating Station.

The Commission found operating revenues for 1949, after adjustments, of $57,017,314. This ultimate figure included an adjustment upward of income or savings due to a fuel cost adjustment clause in the tariff of $525,000, and a deduction of $402,000 to offset the abnormal revenues received under the fuel clause during the coal strike. The City offered a tabulation tending to show that the utility's 1949 revenues were approximately 10 per cent below normal. The Commission rejected this evidence as having no value or factual basis. However, the Commission points out in its order that Duquesne's Exhibit H shows gross operating revenues for the twelve months ended September 30, 1950, of $60,859,929, or approximately 10 per cent in excess of

1949 operating revenues. The Commission rejected such evidence, stating it was not persuasive "because of the unknown effect of concurrent property additions and changes in operating costs." The Commission also relied on the fact that it "must establish a cut-off date wherein all factors are properly correlated."

The annual report of Duquesne for 1950, on file with the Commission prior to the date of the Commission's final order of August 21, 1951, showed a net operating income of $14,251,181. This, of course, was under tariff No. 9, which was superseded by tariff No. 10. As before noted, the Commission allowed a net annual return of $12,900,000, or 6 per cent of its $215,-000,000 fair value finding, which the rates in tariff No. 10 were to yield. Thus, the City contends that Duquesne is earning, under the old tariff, almost a million dollars more than it would have been entitled to earn under the new tariff. In making such calculation the City allows the utility $7,773,476 for property additions during 1950, being one-half of the actual property additions of $15,546,951 made during the course of the year. The Commission, in its brief, disputes the City's figures as to property additions, stating they amounted to $21,000,000 during 1950. At any rate, the latest available figures tend to show there is some merit in the contention of the City and the Industries that the Commission's adjustments favored the utility, i.e., allowed for estimated increased expenses, such as 1950 wage costs, and that it refused to consider figures before it showing substantially greater operating revenues for 1950 than those estimated by the Commission.

We recognize the necessity, as a practical matter, for a cut-off date and the use of a base year in arriving at a final determination. But the Commission cannot be oblivious to recent figures in its own files sup-

plied by the utility. The Commission is given discretionary power to make necessary adjustments to all estimates. But the adjustments must be based on evidence, and cannot be unfairly weighted in favor of either the utility or the consumer. The Commission may not ignore recent information and evidence which substantially affect the problem before it. Allowance must, of course, be made for property additions to the rate base. When the report of a utility shows net earnings substantially greater than those allowable under the tariffs, although the report is not conclusive, under such circumstances an investigation on the Commission's own motion into the rates of the utility would seem necessary. Although base year figures form the foundation of the Commission's determination, the latest available relevant data should be presented to and considered by the Commission. Adjustments for property additions to the rate base are as feasible as adjustments of other estimates bearing on the ultimate finding of fair value. The Commission did adjust 1949 expenses as to items which were at least equally speculative as the necessary adjustments they would have had to make for actual 1950 income experience. The Commission may not have exceeded its authority in failing to make the adjustments for which the City and the Industries contend, but the reasonableness of its action is questionable; and to arrive at a fair and equitable result in this case there should be a re-examination of adjusted 1949 expenses and revenues.

TAXES: Under taxes, exclusive of income taxes, the Commission allowed Duquesne a total of $2,901,-582. Of this amount $987,739 represented a federal tax on sales of electric energy paid by the utility in 1949. This tax (26 U. S. C. A. §3411) was in effect at the time of the Commission's order of August 29, 1951, but in October the United States Congress enact-

ed the Revenue Act of 1951; section 488 of this Act repealed the electric energy tax as of November 1, 1951. The Industries argue that the net effect of the repeal of this tax is to give the utility a saving in its allowed expenses of approximately $1,000,000; and that the result is an approximate 30 per cent increase in the allowable net revenue of $3,500,000 permitted Duquesne by the Commission under its order. There is validity to the argument of Industries in so far as the effect of the repeal of the federal tax on sales of electric energy is concerned. As the record must be remitted for other reasons, the Commission should take into consideration this very material change in Duquesne's allowable tax expense. The Commission should also consider any further available, material evidence on this question. As the Commission said in its present order: "Equity requires that respondent's rates, being made for the future, should be predicated upon the latest tax conditions known."

Duquesne contends that the Commission's allowances to it for federal excess profits tax, state income tax, and federal income tax were inadequate. The Industries claim that the Commission's allowance to the utility for federal income tax was excessive and speculative, and that the allowance was not based on evidence. The Commission found that Duquesne's federal income tax would increase since, under current dissolution proceedings, it could not file a consolidated return with its parent, Philadelphia Company. The Commission also recognized an increase in the state corporate net income tax rate applicable to the utility, the 4 per cent rate being increased to 5 per cent. The total allowed by the Commission for income taxes was $8,798,700, which included $7,952,100 for federal tax and $846,600 for state tax. The utility claimed it would have to pay an increase in taxes of $738,000 under the

Federal Excess Profits Tax Act, approved January 3, 1951. The Commission found that the allowable net revenue was $3,500,000, or less than one-half of $7,-721,000 which Duquesne claimed; that the utility had an excess profits tax credit of $19,000,000; that this is considerably more than the taxable net income resulting from allowable revenues prescribed by its order; that the utility would therefore incur no liability for excess profits tax, and consequently no allowance was required. In its brief Duquesne prints Appendix B which purports to show an excess profits tax liability of $177,494. This of course was not in evidence before the Commission. Further, Duquesne argues on this appeal that the federal income taxes were increased 5 per cent after the order of the Commission had been filed; and that $800,000 would thereby be added annually to its federal tax. The Commission answers this contention of Duquesne by pointing to the fact that the repeal of the federal tax on sales of electric energy reduces its tax burden to the extent of about $1,000,000. It is evident that it is difficult to ascertain the proper allowances for taxes due to changing conditions. The Commission properly observed that, since the rates to be established were prospective, they should be based on the latest available tax calculations. Such allowances as were made by the Commission in the present order were supported by the evidence then before it on that subject. However, as the record will be remitted, the Commission should consider all evidence obtainable as to taxes.

ANNUAL DEPRECIATION: The Commission allowed $4,998,282 for annual depreciation, which amount does not include the utility's claims for annual depreciation of transportation equipment and annual depreciation and depletion of coal mine properties. Such allowances were included elsewhere for annual operat-

ing expenses. The annual depreciation allowance on Duquesne's electric plant consists of straight line reserve allowance of $4,554,727, and remainder life allowance of $443,555. The Commission's allowance for annual depreciation was calculated to permit the utility to recover the original cost of its property. The City contends that the Commission erred in its allowance of annual depreciation in that the allowance was not in harmony with the calculation of accrued depreciation. Allowances for annual depreciation should be reasonably consistent with allowances for accrued depreciation. *Schuylkill Valley Lines, Inc., v. Pennsylvania Public Utility Commission,* supra, 165 Pa. Superior Ct. 393, 402, 68 A. 2d 448. We find no error of law in the calculation of the allowance for annual depreciation. Duquesne contends that the Commission's allowance fails to accumulate enough money to produce a replacement for the property retired, and that annual depreciation should be based upon replacement cost at current prices. In *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 471, 51 A. 2d 497, 504, this Court said: "An annual depreciation allowance cannot logically or consistently be based upon fair value or reproduction cost, but rather the basis for computation should be upon the book cost of depreciable and depletable property." The Commission refused to accept Duquesne's theory of allowing annual depreciation based on reproduction cost at current prices. Such theory is not sound and would produce an inequitable result. Changing price levels would require variations of the annual accrual to be made to the depreciation account. Furthermore, the adoption of Duquesne's contention would require the rate payers to provide, in effect, in periods of rising prices, capital contributions and sustain alone the effects of inflation. *Lindheimer v. Illinois Bell Telephone*

*Co.,* 292 U. S . 151, 168, 169, 54 S. Ct. 658, 78 L. Ed. 1182, 1193, 1194.

PENSIONS: The Commission allowed under operating expenses a welfare and pension expense totaling $936,406. The City questioned the legality of including the sum of $116,210 representing the interest paid by Duquesne on its unfunded pension reserve. The allowance of interest on the unfunded pension reserve was proper under the recent decision of our Supreme Court in *Pittsburgh v. Pennsylvania Public Utility Commission (Appeal of Bell),* supra, 370 Pa. 305, 88 A. 2d 59.

CASH WORKING CAPITAL: The Commission made an allowance for cash working capital of $3,-500,000. In so doing the Commission accepted the claim of the utility that an allowance for cash working capital should be based on a 45-day lag, or one-eighth of its claimed annual operating expenses of $30,850,-895. Duquesne claimed a 45-day lag, based on a month's service to the customer plus 15 days required to read the meter, prepare the bill and receive payment from the customer. In making the above allowance for cash working capital, the Commission was in error. It accepted in toto the utility's figures regarding the alleged 45-day lag. The Commission was in error as to the law applicable, and its review of the evidence on the subject was superficial. The Commission apparently considered that an allowance for cash working capital was necessary in every case where the possibility of a lag in receipts was present. The record will be returned to the Commission so that the question of cash working capital may be reviewed in the light of the recent discussion of the law on that subject by the Supreme Court in *Pittsburgh v. Pennsylvania Public Utility Commission (Appeal of Bell),* supra, 370 Pa. 305, 309-316, 88 A. 2d 59. Was not the alleged 45-day lag materially affected by countervailing factors, such as lag

in payment of obligations or the availability of other funds? As stated in the *Bell* case, 370 Pa. 305, 309, 310, 88 A. 2d 59, 62: "Whether cash working capital should be allowed as an element in determining the fair value of a utility's used and useful property as a rate base, and if allowed, the extent of such allowance, depends upon the factual situation in each case. If the financial situation of an operating company shows that sufficient funds are readily available to bridge the gap between rendition of and payment for services, no cash working capital is required and none should be allowed by the Commission."

DISCRIMINATION: The City alleges the new tariff, No. 10, is discriminatory between classes in that it places a greater percentage of the increased rates on the residential and small commercial consumers. The City says the failure of the utility to make any increase whatever in rates J and M, applicable to Pittsburgh Street Railways, a former affiliate, and other electric utilities, shows inequities in the rate structure. The City contends that the rate charged should be based on the cost of supplying service to the consumer and that cost allocation studies should be made to determine these facts. Section 304 of the Public Utility Law, 66 PS §1144, prohibits only unreasonable discrimination. A mere difference in rates between classes of customers does not establish unreasonable discrimination. *Philadelphia v. Pennsylvania Public Utility Commission,* 162 Pa. Superior Ct. 425, 432, 57 A. 2d 613; *Pittsburgh v. Pennsylvania Public Utility Commission,* 168 Pa. Superior Ct. 95, 102, 78 A. 2d 35. The tariff filed no doubt contains some inequities, but the evidence does not establish unreasonable discrimination. The difference in rates was logical and within the flexible limit of judgment which belongs to the power to fix rates.

The multiple dwelling provision of the tariff, which provides that service to a maximum of five dwelling units may be supplied through a single meter, and, when so supplied, the blockings of the rate will be multiplied by the number of dwelling units, is apparently reasonable. We think the same may be said of the fuel cost adjustment clause to which Industries refer. This clause, applicable to large industrial customers, under rates X, Y, and W, carried over from tariff No. 9, provided for an increase or decrease in cost, depending upon the cost per million BTU of fuel consumed at the utility's generating stations. The cost to the customer was based upon a *fixed* thermal efficiency factor. The majority of the Commission found that, although the utility's generating efficiency had increased, it had not reached a point "which would call for a material change in the thermal efficiency factor." We cannot say, on the evidence in the record, that the fuel cost adjustment clause in the tariff was unreasonable or unlawfully discriminatory. The claim of the Industries, that the cost of electricity to them under the fuel cost adjustment clause is excessive and unreasonable, is not sustained. It is not unreasonable that the charges are related to, or reflect, changes in cost to the utility. The basic rate itself does not seem to be questioned. The increased thermal efficiency factor is not shown to be such that failure of the rates to directly reflect it would render them unreasonable as a matter of law.

EFFECT OF SUSPENSION OF RATES: Acting under section 308 (b) of the Public Utility Law, 66 PS §1148, the Commission suspended the proposed schedule of rates, tariff No. 10, filed by the utility, for a period of nine months, during the course of the investigation to determine the lawfulness of the rates. Section 308 (b) provides in part: "The commission shall consider the effect of such suspension in finally

determining and prescribing the rates to be thereafter charged and collected by such public utility." Duquesne argues that the sentence quoted is mandatory, and that the Commission must make express provision in its order for the utility to recoup its alleged "loss" for the nine-month suspension period, or to the extent of three-fourths of its allowable annual increase in revenue. Duquesne suggests that the alleged loss due to suspension of the new tariff is analogous to rate case expense which could be amortized over a five-year period. The exercise of the power to suspend a proposed rate increase depends upon many factual matters, including the probability of whether the new rates will ultimately be held reasonable; it is primarily an administrative function within the sound discretion of the Commission. *Philadelphia v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 96, 103, 63 A. 2d 391. Presumptively, the Commission considered the effect of the suspension in fixing final rates. It could determine the general effect of the final rates with relation to the suspension, and it was not bound to make a specific monetary allowance for a calculated loss allegedly due to the suspension simply because the final order of the Commission in point of fact allowed a partial increase in rates and allowable revenue. Certainly the Commission was cognizant of its own order of suspension, and, under the circumstances, it may well have concluded that no specific provision dealing with recoupment was necessary. The argument assumes that any increase ultimately allowed in annual revenue automatically establishes a loss due to suspension. Such a construction of this portion of section 308 (b) would deprive the Commission of discretion in the matter of suspension, and reduce the question to a fixed mathematical calculation. The present appeals do not involve any alleged violation of

constitutional rights. Duquesne has not raised the issue of confiscation. The Commission granted it a considerable increase in revenue under new schedules. The order of the Commission is not shown to be erroneous on the mere assertion that the Commission failed to consider the effect of the suspension in prescribing new rates.

The order of the Commission is reversed, the record is remanded for the taking of such additional testimony as may be necessary, and for making of additional findings to accord with this opinion; and, after the adjustment of the findings upon which the present order is based, to require an acceptable tariff to be filed which will produce the annual operating revenues allowed.

Judge HIRT would affirm the order of the Commission except as to capitalization of coal leaseholds.

