Scranton Steam Heat Company, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued September 15, 1960. Before GUNTHER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONTGOMERY, JJ. (RHODES, P. J., absent).

*Anthony C. Falvello*, with him *James E. Riely, Rocco C. Falvello*, and *Creskoff, Riely & Holton*, for appellant.

*Miles Warner*, Assistant Counsel, with him *Louis J. Carter*, Assistant Counsel, and *Joseph I. Lewis*, Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

*Morey M. Myers*, with him *James W. McNulty*, for City of Scranton, intervening appellee.

*Sheldon Rosenberg*, with him *Nogi, O'Malley & Harris*, for intervening appellee.

OPINION BY GUNTHER, J., December 14, 1960:

In this public utility rate proceedings, Scranton Steam Heat Company has appealed from the order of the Public Utility Commission, dated April 28, 1960, rejecting a rate increase proposed by appellant.

On April 28, 1959, appellant filed Supplement No. 8 to Tariff Steam Heat—Pa. P. U. C. No. 1, to become effective July 1, 1959, providing for increased annual operating revenue in approximately $171,000.00 (20.16%) based upon the level of operations at February 28, 1959, the cutoff date and end of the test year used in these proceedings. Appellant renders steam heat service to approximately 994 consumers in the downtown section of Scranton, Pennsylvania, having acquired the steam heat facilities from Pennsylvania Power & Light Company, which in turn, had acquired the facilities by merger with Scranton Electric Company in January, 1956.

Prior to the effective date of the proposed rates, complaints were filed by the City of Scranton on May 13, 1959 (C. 17189), and by Harry Klein, a customer, on June 15, 1959 (C. 17203). By order of the commission dated June 22, 1959, the operation of the proposed supplement was suspended for six months to January 1, 1960, and at the same time, instituted an investigation at C. 17206 for the purpose of determining the fairness, reasonableness and legality of the rates, charges, rules and regulations proposed. By order dated December 21, 1959, operation of the proposed supplement was suspended for an additional three months to April 1, 1960, and a further suspension of one month was agreed to by counsel for all the parties. The proceedings under each of the complaint dockets were consolidated at the first hearing on July 22, 1959. Thereafter, between July 22, 1959 and March 1, 1960, hearings were held on thirteen days,

compiling 1761 pages of testimony and 64 exhibits submitted by appellant.

During the course of hearings, appellant submitted three measures of value consisting of (1) original cost of construction, (2) reproduction cost at spot prices as of February 28, 1959 and (3) reproduction cost at average prices for five years ending December 31, 1958. The commission disallowed entirely in these computations the claim for cash working capital and reduced the claim for materials and supplies to $230,000.00. Since appellant does not question these modifications on this appeal, the modified measures of value considered as submitted by appellant are as follows:

| Original Cost: | Reproduction Cost at: Spot Prices | Reproduction Cost at: Five Yr. Av. Prices |
|---|---|---|
| $2,232,184.00 | $5,771,652.00 | $4,074,250.00 |

Appellant company introduced extensive evidence in support of its claims of original cost of its plant, reproduction cost and accrued depreciation. Rebuttal testimony was introduced on behalf of Harry Klein attempting to show that appellant had under-accrued depreciation on its plant and attempting to show that a large part of the plant, including the boilers particularly used for steam production, were no longer used and useful in the public service.

The commission found that appellant's determination of the original cost of construction was arrived at by a routine application of long-accepted law and precedents. However, the commission concluded that it did not consider it "necessary here to weigh and distinguish at length the decisions . . . which relate to determination of fair value of utility property in general and original cost in particular." It created its own measure of value based upon the cost to appellant to acquire this property from Pennsylvania Power & Light

Company on September 26, 1956. The commission re-
fused to consider the original cost of construction and
the reproduction cost measures of value. Using the
acquisition cost as the measure of value, the commis-
sion found a fair value of $900,000.00, which was 17%
over and above its measure of value, in recognition of
"going concern value and the decline in the value of
the dollar."

The commission found that under present rates, ap-
pellant would have income available for return in the
amount of $57,778.00, which provides a return of
6.42% on the fair value finding of $900,000.00, and
that under the proposed rates the income available for
return would be $144,715.00, or a return of 16.08%
on the same $900,000.00 rate base. It concluded that
existing rates produce a reasonable and fair return and
entered its order sustaining the complaints and reject-
ing the proposed increase in its entirety. Appellant's
annual depreciation allowance in the amount of $106,-
900.00 based upon original cost of construction was
rejected and an annual depreciation of $49,000 was al-
lowed. However, on these appeals, appellant questions
the commission's order only as it relates to the find-
ing of fair value based only on acquisition cost and the
allowance for annual depreciation.

In support of substituting acquisition cost as the
sole measure of value in lieu of original cost of con-
struction and reproduction cost, the commission deemed
that the production plant was designed and construct-
ed primarily for use in generating steam and electricity
rather than steam heat and, therefore, the acquisition
cost of all the property at the time electric generation
was abandoned was devoted by appellant solely to the
production of steam heat. The logic of this reasoning
might be applicable to appellant's production plant
but the commission extended it to appellant's land
(original cost $12,251), distribution system (depreci-

ated original cost of $915,260) and general plant (depreciated original cost of $19,467).

Appellant contends that the commission's action and findings are contrary to law, conflicting and contrary to the evidence, which results in discrimination and confiscation of its property.

The property acquired and used in the steam heat service falls into three general categories: (1) production system, consisting of boiler plant and related structures; (2) distribution system, consisting of steam mains, services, meters and related equipment; and (3) general property. The production plant was used by former utilities for both electric and steam heat service. The distribution system and general property were used only in steam heat service. Pennsylvania Power & Light Company as well as Scranton Electric Company operated the production property purchased by appellant to produce steam used in the generation of electricity and for supplying steam heat. Scranton Electric Company operated several boiler plants for the production of steam, two of which (Illuminating Plant and the Suburban Low Pressure plant) produced steam for both the generation of electricity and the supplying of steam heat. Originally, because the production plant produced steam used to generate both electricity and to supply steam heat, the commission allocated the production plant to each of the services when Scranton Electric Company applied for rate increases. In the 1953 proceeding the commission found that 60% of the boiler plant was devoted to electric service and 40% was devoted to steam heat service. Consequently, only 60% of the boiler plant was included in the electric rate base, the other 40% being allocated to steam service. The steam distribution system and general plant used to supply steam heat service were included entirely in the steam heat rate base and not in the electric rate base.

In 1956 Pennsylvania Power & Light Company, having no further need for the *production plant* for electric generating purposes and it being useful for supplying of steam heat, sold this together with the steam heat property. The commission found that only the portion of the production plant found useful in steam heat service was offered for sale. Of the total production plant (with an original cost of $6,981,000), appellant purchased items with an original cost of only $2,245,800. The production plant acquired by appellant was that portion of the Suburban Low Pressure plant useful for supplying steam heat service. No part of the Illuminating plant, previously utilized for steam heat service, was acquired. The commission so found and the evidence clearly supports such finding. The total original cost of all property which the commission found "was arrived at by a routine application of long-accepted law and precedent" amounted to $4,033,716, consisting of production plant of $2,388,335, distribution plant of $1,615,951, general plant of $24,173 and organization cost of $5,257.

After deducting accrued depreciation calculated on the basis of and at rates established by prior depreciation findings of the commission applicable to this property, and utilizing previous rates of depreciation from predecessor engineering studies, all of which were compared with an Iowa Curve age-life study, the original cost amounts to $2,002,184 consisting of $12,251 in land, $199,544 in structures, $850,405 in boiler plant, $915,260 in distribution system, $19,467 in general property and $5,257 in organization cost. We have held that the use of prior commission findings on depreciation was proper. *Pittsburgh v. Pa. P. U. C.*, 174 Pa. Superior Ct. 4, 7, 98 A. 2d 249. Likewise the making of a comparative Iowa Curve depreciation study, based upon the survivor experience of a comparable utility has been approved by us in *Duquesne Light*

*Company v. Pa. P. U. C.,* 176 Pa. Superior Ct. 568, 581, 107 A. 2d 745.

### Reproduction Cost

Appellant submitted voluminous testimony and exhibits on the reproduction cost at spot prices as of the cutoff date and at five-year average prices. These cost studies were prepared by a qualified engineering firm and its detailed inventory was not materially questioned. It should have been considered by the commission as a basis upon which to determine values which are considered in determining fair value. *Solar Electric Company v. Pa. P. U. C.,* 137 Pa. Superior Ct. 325, 350, 9 A. 2d 447. The spot price reproduction cost was determined by applying unit costs to inventory, unit costs being those based on prices and labor costs applicable to the city of Scranton. The five-year average reproduction cost was prepared by relating the average of the index numbers for each of the five years, 1954 through 1958, to the corresponding index numbers at February 28, 1959, the cutoff date, for each of the various classes of property. The factors developed were applied to individual items of property, groups of similar items and, in a few instances, to the account as a whole where found to be appropriate. These reproduction cost estimates were checked by comparisons with the general and building construction cost indexes as published in recognized engineering news record. In making this study, appellant included considerations of physical deterioration, lack of usefulness, superadequacy, changes in the art, and remaining economic value of the property.

The spot price reproduction cost, after deducting accrued depreciation, amounted to $5,536,827. The five-year average reproduction cost, after depreciation amounted to $4,839,675. The commission recognized that these measures of value were presented according to long-established law and precedents. Based up-

on these measures of value, the $144,715 found available for return under the proposed rates does not appear unreasonable. Such return amounts to 6.5% on the original cost of construction measure of value without consideration given to reproduction cost. As observed in *Johnstown v. Pa. P. U. C.*, 184 Pa. Superior Ct. 56, 66, 133 A. 2d 246, although no special formula was approved, the commission has been inclined to establish fair value at a point near the average of original cost depreciated and reproduction cost depreciated. In this case, nevertheless, the commission refused to consider the original cost of construction as well as reproduction cost and substituted for these traditional measures a newly created measure based upon the acquisition cost at the time appellant purchased this property in 1956. The commission began with the acquisition cost of $250,000, deducted $73,500 accrued depreciation, added net plant additions installed by appellant of $357,656, plus organization costs of $5,257, and materials and supplies of $230,000 to arrive at an acquisition cost measure of value of $769,413. Then without considering either the original cost of construction or the reproduction cost measures of value, the commission fixed a fair value of $900,000. On such a fair value rate base, the existing rates produce a return of 6.42% and the proposed rates a return of 16.08%.

The sole reason advanced by the commission for using acquisition cost in place of the traditional measures was the purported change in the use and service of the production plant previously devoted to the generation of electricity as the production of steam heat service. We do not see the logic in this so-called change of use and, what is more important, is not supported by the evidence. Assuming this change of use theory has some possible validity, it should be applied only to the production plant and not to the other prop-

erty acquired by appellant. For original cost of construction as an established measure of value as approved in *Scranton-Spring Brook Water Service Co. v. Pa. P. U. C.*, 165 Pa. Superior Ct. 286, 294, 67 A. 2d 735, and for fair value itself, the commission substituted acquisition cost to the present owners, a fundamental departure from precedent and contrary to our rejection of "invested capital" and "book value" as proper rate bases. See *Peoples Natural Gas Co. v. Pa. P. U. C.*, 153 Pa. Superior Ct. 475, 485-486, 34 A. 2d 375. We have stated in *Pittsburgh v. Pa. P. U. C.*, 187 Pa. Superior Ct. 341, 349, 144 A. 2d 648, that "Fair value for rate-making purposes, however, is not the literal present fair value for any particular purpose, but it is the fair value of the property as that term is understood for rate-making purposes; in this respect fair value has a connotation peculiar to rate proceedings. There is no particular formula by which the commission is bound in fixing the rate base; all facts which have a relevant bearing on fair value, as that term is used in rate proceedings, should be considered . . . 'Under the fair value rule prevailing in this state, consideration should be given to original cost and *average price* reproduction cost of the property; . . .' " The commission is required, in fairness to both the utility and the customer, to reject as the predominant measure of value any particular measure which would be unreasonably advantageous to one at the expense of the other. Neither original cost, nor any other single measure of value is considered the equivalent of fair value and need not be given predominance by the commission in fixing a rate base. But where the commission ignores the traditional measures of value, its action amounts to an error of law. *Solar Electric Company v. Pa. P. U. C.*, 137 Pa. Superior Ct. 325, 344, 9 A. 2d 447.

## Original Cost

The original cost which is required to be considered is the original cost of construction. *Scranton-Spring Brook Water Service Company v. Pa. P. U. C.*, 165 Pa. Superior Ct. 286, 295, 67 A. 2d 735; *Harrisburg Steel Corporation v. Pa. P. U. C.*, 176 Pa. Superior Ct. 550, 556, 109 A. 2d 719. The amount paid by the company in acquiring the utilities, even if it be assumed that the transactions were at arms length, cannot be adopted as original cost for rate making purposes. *Pittsburgh v. Pa. P. U. C.*, 171 Pa. Superior Ct. 187, 201, 90 A. 2d 607. The commission gave as a reason for refusing to consider the original cost of construction and reproduction cost measures of value that the acquisition cost initially paid by appellant to acquire this property could reasonably be concluded to be the fair value of the property at the time of acquisition. There is no evidence in this record to substantiate such a conclusion and, even if there were, it would afford no basis for ignoring completely the original cost of construction and reproduction cost.

A change in the ownership of the property originally dedicated to public use does not change the fact that original cost was initially spent to establish the facilities and put them into service for the public. Thus, each time the property changes ownership a new original cost of construction has not been expended. *Harrisburg Steel Company v. Pa. P. U. C.*, 176 Pa. Superior Ct. 550, 556, supra. In *Berner v. Pa. P. U. C.*, 177 Pa. Superior Ct. 19, 24-25, 107 A. 2d 882, we have very clearly indicated that the original cost of construction should be considered in determining fair value and is the lawful and reasonable measure. When, therefore, the commission substituted acquisition cost for original cost, it erred as a matter of law. The original cost of construction entitled consideration as the starting point in determining fair value.

*Reproduction Cost*

The commission ignored reproduction cost solely because of the acquisition of this property in 1956. We have stated that the present fair value rule requires that reproduction cost be given consideration. *Solar Electric Company v. Pa. P. U. C.*, 137 Pa. Superior Ct. 325, 335, 9 A. 2d 447; *Pittsburgh v. Pa. P. U. C.*, 187 Pa. Superior Ct. 341, 349, 144 A. 2d 648. Average price reproduction cost should be considered notwithstanding that it has been said to be merely theoretical and that it is improbable that any plant would be reproduced in its entirety. Reproduction cost should be considered even though a substantial portion of the utility's property is of recent origin. *Riverton Consolidated Water Company v. Pa. P. U. C.*, 186 Pa. Superior Ct. 1, 11, 140 A. 2d 114. Consequently, when the commission utilized the acquisition in 1956 as its sole reason for ignoring reproduction cost of all or part of appellant's plant, it acted contrary to our pronouncements in this regard.

The only reason for not giving weight to reproduction cost, in whole or in part, would be in situations where such a high degree of obsolescence exists that no responsible management would consider the reproduction of the plant. *Philadelphia v. Pa. P. U. C.*, 173 Pa. Superior Ct. 38, 51, 95 A. 2d 244. In this proceeding there was some question raised concerning the extent to which there was obsolescence existing in appellant's boiler plant. This, however, accounts for less than half of the total net depreciated original cost of the plant and less than half of the total net depreciated reproduction cost of the plant. The remainder of appellant's property, especially the distribution system, could not be considered obsolete. -The obsolescence found to exist in the boilers was that of an improvement in the design of boilers. This obsolescence, however, was considered, measured and ac-

counted for in the deduction for accrued depreciation as the law provides.

The commission found, however, that appellant has made substantial plant improvements since acquisition amounting to $357,656. This situation is not in any way comparable to the functional obsolescence of street railway systems, which have experienced an extraordinary decline in use by customers, under the rule of the *Philadelphia* case, supra. As a matter of fact, the commission specifically found that since acquisition, appellant's business has increased steadily; that steam sales have increased 20% since 1949 and that radiation service has increased 29%. Consequently, the reproduction cost of all appellant's property should have been considered as a proper measure of value.

## Annual Depreciation

The commission allowed annual depreciation in the amount of $49,000 calculated upon the "actual plant investment" of $613,000 used as a measure of value. Appellant claimed annual depreciation in the amount of $106,900 based upon original cost of construction.

The annual depreciation charge which is allowed is the depreciation calculated upon the original cost of construction of the property. It is an operating expense and represents the consumption of assets in rendering service and a utility is entitled to recover from the consumer the original cost of depreciable property. *Harrisburg Steel Corporation v. Pa. P. U. C.*, 176 Pa. Superior Ct. 550, 560, 109 A. 2d 719; *Pittsburgh v. Pa. P. U. C.*, 187 Pa. Superior Ct. 341, 356, 144 A. 2d 648. The annual depreciation claimed by appellant was calculated with the method of calculating accrued depreciation on original cost. The rates of depreciation were the same as those utilized by the commission in a prior rate proceeding with respect to the production plant and the same rates as those used by its prede-

cessor with regard to the distribution system, except for garage equipment.

Appellant, using these previously established rates to the original cost of construction, arrived at a depreciation figure of $106,900. The commission, using actual plant investment of $613,000, applied a remainder life theory of 8% a year or $49,000 per year. While we find no fault with the percentage application used by the commission, it appears that the base amount used in calculating such rate depreciation is not supported by any established principle. However, even if the commission's change in use and service contention be applied to the production plant, the evidence discloses a base of $915,260 for the distribution system, $19,467 for general property, $18,064 net additions to structures since acquisition, $294,129 net additions to boiler plant since acquisition, or a total of $1,246,810. Utilizing the 8% annual depreciation resulting from the application of the remainder life theory indicates an annual depreciation of $99,745. This amounts to $50,745 increase over the $49,000 allowed by the commission, which reduces the return under the proposed rates found by commission from $144,715 to $93,970. This return amounts to a rate return of 6.2% upon the modified original cost measure of value. This rate return is neither unfair nor unreasonable.

In arriving at a fair value of $900,000, we believe the commission reached several conclusions which are not supported by the evidence. The finding that the boiler plant originally was constructed and used primarily for the generation of electricity is not supported by any evidence. As indicated before, in the prior electric proceedings of Scranton Electric Company (31 Pa. P. U. C. 650, 658-660), the commission found that 40% of the boiler plant installation was allocable to steam heat service. Appellant purchased that portion found useful in rendering steam heat. It appears,

therefore, that this finding is contrary to an earlier finding in allocating the entire production plant to two services, one for electric generation and one for steam heat service. This prior allocation of the production plant to each service was required under section 311 of the Public Utility Law, 66 P.S. section 1151. Since the commission found that only that portion useful for supplying steam heat service was sold to appellant, the finding in this regard above is without evidence and erroneous.

The commission stated that it was reasonable to conclude that the acquisition cost represented fair value of the property for the limited use and service to which it would or could be devoted thereafter. However, the record clearly indicates that the reason for the $250,000 sales price was the desire of Pennsylvania Power & Light Company to discontinue rendering steam heat service in Scranton after merger and after it ceased generation of electricity at this plant. It is fairly obvious that after the merger with Scranton Electric Company, Pennsylvania Power & Light Company, in order to be relieved of the necessity of continuing this service, was willing to sell at a substantially reduced price so as to retire from this field of service. There was no evidence as to how the price was arrived at or that this was indicative of the market value at that time or what relationship this price had to the possibility of being required to continue such service. In any event, acquisition cost does not become a substitute for original cost under our decisions.

The commission referred to use to which the production plant was put by appellant's predecessor for the generation of electricity and steam heat service. It then applied the limited use or usefulness found to exist in the *production plant* to *all* of the property, including the distribution system and general plant

which have been devoted solely to steam heat service, and land which had no relationship to any particular utility service. If the limited use and service theory had any application at all, it had to be applied only to the production plant. The items above were not designed for rendition of dual service.

Had not Pennsylvania Power & Light Company sold this property to appellant, it would have been required to operate it for steam heat service and its rate base would be determined by consideration of the original cost of construction, except that the total production plant would have been allocated on the basis of 40% to steam heat as against 60% to generation of electricity. This determination would have been based on a previous allocation made by the commission. If, therefore, the rate base for Pennsylvania Power & Light Company would encompass the original cost of construction of those facilities used in steam heat service, the ultimate cost to the consumer would be relatively the same as that proposed by the appellant. What other legal basis could be used by the commission? We fail to see the application of an entirely new measure of value based upon the cost of acquisition simply because of a change in ownership. The fundamental principles to be applied in determining fair value for rate making purposes do not turn on the question of ownership but upon factors to which we alluded and which are well established both in the Public Utility Law (66 P.S. sections 1150 (a), 1212) and in the decisions.

The commission frankly conceded its refusal to follow accepted norms for determining fair value but based its refusal so to do because it considered fair value to be acquisition cost. While it is true that the commission is not bound to any specific formula to determine fair value, it cannot take one factor as the formula and conclude "that the sale price represented

the fair value of the property at the time of acquisition . . ." It cannot make a lump sum valuation. *Scranton-Spring Brook Water Service Company v. P. S. C.*, 105 Pa. Superior Ct. 203, 210, 160 A. 230. The commission need not give equal weight to all measures of fair value, but neither can it weigh fair value only by one consideration.

We conclude, after a review of this record, that the order of the commission is not consistent with its findings of facts; that there is a lack of evidence to support its findings, and that there is error of law. When the reasons advanced by the commission for ignoring traditional measures of value are erroneous in whole or in part, the order should be reversed. *Pittsburgh v. Pa. P. U. C.*, 171 Pa. Superior Ct. 187, 198, 90 A. 2d 607.

The order of the commission is reversed and the record is remanded for the entry of an appropriate order not inconsistent with this opinion.

RHODES, P. J., took no part in the consideration or decision of this case.

———

CONCURRING AND DISSENTING OPINION BY MONT-GOMERY, J.:

I concur in part with the results attained by the majority for the sole and basic reason that the Commission refused to consider any factor relating to the fair value of the respondent's property except acquisition cost. This manner of appraisal is contrary to all established principles of law. There may be many reasons for giving greater weight to and placing more importance on acquisition costs in this case but there is no justification for the failure to give some consideration to all of the other elements that generally determine fair value.

However, I do not concur in the remand of this case merely for the entry of an appropriate order. I would remand it for reconsideration by the Commission of the entire record in the light of the majority opinion, and for the entry of such new order as to the Commission may seem appropriate and just after such reconsideration.

---

DISSENTING OPINION BY WRIGHT, J.:

I respectfully dissent. It is my view that the order of the Commission is supported by the evidence, and is in compliance with the law.

Some years ago, the Scranton Electric Company constructed a plant for the production of electricity. A by-product of the electricity produced was excess steam, which was sold to various commercial and public consumers. On January 31, 1956, the Pennsylvania Power & Light Company acquired the plant and continued its use for the production of electricity. On September 14, 1956, the Scranton Steam Heat Company, hereinafter referred to as appellant, was organized. Appellant is a wholly owned subsidiary of the Pennsylvania Utilities Investment Corporation. On September 26, 1956, as a result of an arm's length transaction, appellant purchased a portion of the plant for a total consideration of $250,000.00. The facilities purchased by appellant were no longer useful in the production of electric energy, but had some remaining usefulness in the production of steam for heating purposes. Appellant thereafter requested approval of a sixteen percent rate increase, seeking to persuade the Commission that, when the test year ended on February 28, 1959, the depreciated original cost of its plant, purchased for $250,000.00, was $2,002,184.00, and that its depreciated reproduction cost was $5,932,327.00. Appellant contends that the Commission should have

valued the plant at a level somewhere between these two figures. The Commission arrived at an over-all fair value of $900,000.00, which comprised (a) the arm's length price actually paid by appellant for its plant seventeen months before the start of the test year, (b) the actual cost of plant since added, (c) organization costs, materials, and supplies, and (d) an additional allowance of seventeen percent of the net total, after depreciation adjustment, for going concern value and the effects of inflation.

My examination of this voluminous record reveals that the Commission did not err, under the particular circumstances, in treating the purchase price as a separate and independent measure of value and according predominant weight to it. Appellant was the first utility created for the sole purpose of furnishing steam heat from facilities originally designed for the production of electric energy—the first utility solely devoting the steam heat facilties to the public service. In effect, appellant applied for authority to exact from its relatively captive patrons an annual return based upon a non-existent original cost, plus yearly depreciation charges by virtue of which appellant would recover this exorbitant sum during its estimate of the plant's remaining life. In my opinion, the Commission properly concluded that the proposed rates were unreasonable and excessive.