ARKANSAS POWER & LIGHT COMPANY *v.* ARKANSAS PUBLIC SERVICE COMMISSION.

5-875                                                289 S. W. 2d 668

Opinion delivered April 16, 1956.

[Rehearing denied May 21, 1956.]

226

*House, Moses & Holmes, W. H. Holmes, Ed. B. Dillon, Jr.,* and *Richard McCulloch,* for appellant.

*John R. Thompson, Tom Gentry,* Attorney General, *Ben J. Harrison,* Asst. Atty. General, *Reed W. Thompson, James K. Young, Jabe Hoggard, O. D. Longstreth, Jr., Dave E. Witt* and *Joseph R. Brooks,* for appellee.

*P. A. Lasley,* amicus curiae.

J. SEABORN HOLT, Associate Justice. Proceeding under the provisions of Act 324 of the Acts of the Legislature of 1935 [Sec. 73-201 et seq. Ark. Stats. 1947] and an order of the Commission made June 24, 1944, appellant, Arkansas Power and Light Company, on May 27, 1954, filed its application with the Arkansas Public Service Commission asking for approval of an increase in electric rates over its present rates in order to increase appellant's revenues in the amount of $3,900,000. In its petition the power company appears to admit that its overall net earnings then amounted to a rate of return in excess of 5%. Following a long and patient hearing, resulting in the taking of more than 1,500 pages of testimony, the Commission found that the company was earning—,5.985%,—approximately 6%, all to which it was entitled, and denied the company's petition. Later (December 2, 1954) the company's petition for a rehearing was filed and also denied. Thereafter, (December 3, 1954) after filing an additional bond in the amount of $1 million, the company appealed to the Circuit Court of Pulaski County and that court, after a consideration of the record made before the Commission, on September 23, 1955 dismissed the company's petition for review and in all things affirmed the Commission's findings. This appeal followed.

At the outset we point out certain well defined rules governing this court in reviewing the powers and actions of the Arkansas Public Service Commission in a utility rate case such as is presented here. The Commission must and does have broad powers and is a fact finding body. Our Legislature has delegated and entrusted the administration of Act 324 to the Commission, and not to the courts. The primary object of the

Commission is to provide that rate of return which is adjusted to appellant's needs consistent always with the interest of the public. Apart from the judicial review that may be resorted to under the Act, it is not for us to advise the Commission how to discharge its functions. When an appeal is taken to the circuit court, that court, as well as this court on appeal from the circuit court, shall not extend the review of the Commission's findings and actions "further than to determine whether the Department [Commission] has regularly pursued its authority, including a determination of whether the order, or decision under review, violated any right of the complainant under the Constitution of the United States or of the State of Arkansas." [Sec. 73-233 (d) Ark. Stats.] The Circuit Court, and this court on appeal, reviews the Commission's findings on the record before the commission, and if we find any substantial evidence to support it, it is our duty to permit the Commission's order to stand if it is not arbitrary and is free from fraud. We said in the recent case of *City of Fort Smith* v. *S. W. Bell Tele. Co.*, 220 Ark. 70, 247 S. W. 2d 474, "If the Department's [Commission] order is supported by substantial evidence, free from fraud, and not arbitrary, it is the duty of the Courts to permit it to stand, even though the Courts might disagree with the wisdom of the order."

As to the power of the Commission to regulate rates of utilities § 73-218 Ark. Stats. 1947 provides: "The Department [Commission] upon complaint, or upon its own motion, shall, upon reasonable notice and after a hearing, have the power to: (1) Find and fix just, reasonable and sufficient rates to be thereafter observed, and enforced and demanded by any public utility."

The Commission on November 22, 1954, after the extended hearing as indicated, made the following findings: "1. The Commission has jurisdiction under applicable statutes to determine the reasonableness of the Company's rates upon its own motion or upon application of the Company for approval of a change in rates. 2. The filing of a new rate schedule and application for

approval thereof by the Company put in issue the reasonableness of the rates, and in that connection the Commission has the right to determine any and every question incidental and pertinent thereto, notwithstanding its previous orders.  3.  Consistent with the law and reason, the question of whether the company's rates are reasonable depends upon the amount of the rate base and the rate of return determined in the light of present day conditions and circumstances, and not upon a formula process for determining the rate base of the Company devised in the year 1944 which obviously did not contemplate conditions and circumstances now apparent which require adjustment of such process; nor upon the fairness of a rate of return calculated under conditions and circumstances in the year 1944.  4.  In determining the rate base of the Company, as well as determining the revenue and expenses of the Company, for the purpose of determining whether it is earning an adequate return upon its investment, some point of time must be fixed for the purpose of submitting pertinent facts and data, and in this proceeding sound reasoning requires that this period be fixed as the year commencing April 1, 1953 and ending March 31, 1954, which is the period used by the Company in submitting its application in this proceeding.  5.  In determining the Electric Rate Base as provided for in the 1944 order, the percentage relationship between electric property and total property must be determined in order to arrive at the electric rate base, which is the portion of capital, liabilities and surplus that is invested in electric property according to the procedure specified in the 1944 order. All of Account 100.3, Construction Work in Progress, is included in electric property; and over the past ten years the Company's plant under construction has included substantial amounts which represented plant which, upon completion, brought in additional income or reduced expenses of operation.  It is improper to use this plant under construction in the determination of the rate base unless some provision is made for the inclusion of additional revenues, or the exclusion of expenses saved, particularly where it appears that interest is

capitalized by the Company during the construction period which, as of the period, ending March 31, 1954, amounted to $1,097,655. The better procedure is to remove from electric property that portion of plant under construction which, when completed, will be revenue producing, or will effect substantial savings in operation cost; and Appendix (i) shows the calculations as they should be made for the applicable period.

[Appendix i                        Arkansas Power & Light Company
**Determination of Deficiency in Return Under Staff Motion**

| Line No. | Acct. No. | Account | April 1, 1953 | March 31, 1954 |
|---|---|---|---|---|
| 1 | | Net Capital from Company Ex. "D" | $166,236,709 | $187,086,539 |
| | | **PLANT** | | |
| 2 | 100 | Electric Plant | 180,308,933 | 218,021,909 |
| | | Less: | | |
| 3 | | Plant under construction which is deemed to be revenue-producing when completed | 22,096,692 | 29,269,798 |
| 4 | | | $158,212,241 | $188,752,111 |
| | 250.1 | Less: | | |
| 5 | | Reserve for Depreciation or Retirement of Electric Plant | 18,391,574 | 20,290,970 |
| | 250.2 | Reserve for Amortization of Plant Acquisition Adjust- | | |
| 6 | | ments | 1,724,478 | 2,137,547 |
| 7 | | NET ELECTRIC PLANT | $138,096,189 | $166,323,594 |
| | | **OTHER PROPERTY** | | |
| 8 | 110 | Other Physical Property | 93,774 | 14,063 |
| 9 | 111 | Investment in Associated Companies | 17,000 | 17,000 |
| 10 | 112 | Other Investments | 23,000 | 32,000 |
| 11 | | Plant Under Construction per Line 3 above | 22,096,692 | 29,269,798 |
| 12 | | TOTAL OTHER PROPERTY | $ 22,230,466 | $ 29,332,861 |
| 13 | | TOTAL NET PROPERTY | $160,326,655 | $195,656,455 |
| 14 | | PER CENT — Net Electric Plant of Total Net Property (Line 7 ÷ Line 12) | 86.13% | 85.00% |
| 15 | | ELECTRIC RATE BASE (Line 1 × Line 14) | $143,179,677 | $159,023,558 |
| 16 | | AVERAGE RATE BASE FOR PERIOD | | 151,101,618 |

(Page 2 of 2)

### ANNUAL ALLOWABLE RETURN

| | | | |
|---|---|---|---|
| 6% of Rate Base — Page 1, Line 16 ($151,101,618 × .06) | 9,066,097 | | |
| Interest on Customers' Deposits from Company Exhibit "F" | 96,258 | | |
| Amortization of Plant Acquisition Adjustments from Company Exhibit "F" | 415,070 | | |
| Base Allowable Return | | $ | 9,577,425 |

### AVAILABLE FOR ALLOWABLE RETURN

| | | |
|---|---|---|
| Year Ended March 31, 1954 from Company Exhibit "G," Page 2 | 9,358,255 | |
| Less: Over-accrual from Income Taxes (Tr. Page 753) | 196,482 | |
| Total Available Return | | 9,554,737 |
| DEFICIENCY IN RETURN (Line 4 - Line 7) | | $ 22,688] |

The portions of the amounts in plant under construction which represent plant which will be revenue-producing when completed, $22,096,692 at April 1, 1953, and $29,269,798 at March 31, 1954, should be included in the classification of "Other Property." To include this plant under construction in electric plant in calculating the rate base would result in distortion because the Company would be permitted to earn a return on that property before it is useful in providing utility service and before the full influence of the property on revenues and expenses has been felt. By this process the Electric Rate Base as of April 1, 1954, is $151,101,618.

"6. While the Commission's order of June 24, 1944, specified a rate of return of 6%, Arkansas Statutes and Court decisions do not require that the rate of return be 6%. The only requirement is that the rate of return be reasonable. In Appendix (i) [above], a rate of return of 6% has been applied to the rate base of $151,-101,618, and the resulting figure $9,066,097, is the annual allowable return. To this figure are added $96,258, which represents interest on customers deposits, and $415,070, which represents amortization of electric plant acquisition adjustments. Both of these figures are taken from Company Exhibit "F." The total $9,577,425, is the base allowable return. 7. On the basis of the Company's operating revenues and operating expenses for the year

ended March 31, 1954, the amount available for allowable return has been determined to be $9,358,255 according to Company Exhibit "G." To this, the amount of $196,482 should be added because of over-accrual of Federal Income taxes during the year ended March 31, 1954. The total of these two amounts is $9,554,737, which is the total available return. The total available return, $9,554,737, after taking into consideration the allowances for interest on customers deposits and the amortization of electric plant acquisition adjustment, represents a rate of return of 5.985% on the rate base as determined in Appendix (i). The difference between this and the 6% allowable under the 1944 order expressed in dollars amounts to $22,688, which is negligible. 8. Therefore, (1) the application of the Company to increase its rates should be dismissed; (2) the company should refund to its customers all amounts collected in excess of those amounts which would have been collected under the superseded rates, by rates placed into effect under bond; (3) the order of June 24, 1944, with respect to Sections II-A and IV-A should be amended, as hereafter provided. It is, therefore, ordered that: 1. The application of the Arkansas Power and Light Company for increase in its rates which was filed with this Commission on May 27, 1954, be, and is hereby, dismissed. 2. The Arkansas Power and Light Company within sixty (60) days from date of this order shall make refund to its customers all amounts collected in excess of those accounts which would have been collected under the rates superseded by the rates placed into effect under bond together with interest at the rate of six per cent (6%) per annum. 3. Section II-A of the order of June 24, 1944, be, and is hereby amended as follows: . . . " Then follows the amendment which would, in effect, disallow, as part of the rate base Account 100.3 (Work Under Construction) supra, and also would disallow the right to capitalize 6% thereon as part of the rate base. As thus amended, "the order of June 24, 1944, and amendments thereto, shall be continued in full force and effect. This order shall become effective fifteen (15) days from the date hereof."

232

For reversal appellant presents the following points: "I. The Commission's Amendment of its own Prudent Investment Standard was arbitrary and unreasonable and its findings of fact are not supported by any substantial evidence.

"The arbitrary Amendment of the June 24, 1944, Order deprives Company of its property without due process of law. II. The Commission's Findings of Fact and its Selection of a Test Period were not supported by the evidence and were arbitrary. The Commission's action deprived the company of due process of law. III. The Company was denied its Constitutional Rights of Procedural Due Process of Law. (a) The Commission denied the Company due process by amending the order of June 24, 1944, without prior notice to the company or a hearing and acted beyond the powers granted by Act 324 of 1935. (b) The Commission denied the Company due process by rejecting all evidence of operations after March 31, 1954, without prior notice and hearing to the Company. IV. The Commission's Order of November 22, 1954, was retroactive in effect and is therefore void. V. The Commission's calculations and findings were erroneous and contrary to the order of November 22, 1954."

The record reflects that the company, pursuant to the 1944 order, kept three separate accounts: (1) Account 100.1 denominated Plant in Service, (2) Account 100.3 — "Construction Work in Progress" and (3) a special account called "Excess Net Electric Revenue Deferred Credit Fund" and was required to place in this last fund any earnings in excess of 6% of its capital investment allowed under the 1944 order. So, appellant, in effect, will always be held to 6% earnings.

In short, appellant stoutly argues (1) that the Commission was bound by the 1944 order which required it to follow the Prudent Investment theory, invaded its constitutional guarantee of due process and equal protection by refusing to include as a part of the rate base a proper average, or portion, of Account 100.3 (Construction Work in Progress) and also 6% interest thereon,

in the amount of $1,097,655. In this connection appellant says: "The inclusion of construction work in progress in the rate base is expressly authorized by the order of 1944 and the accrual of interest during construction is authorized by the Uniform System of Accounts." Appellant further contends, (2) that the Commission was without authority to change the 1944 order without first giving notice to appellant, and (3) that the Commission arbitrarily selected the testing period of the 12-month period ending March 31, 1954, and in refusing to consider as an additional testing period that period from March 31 to August 31, 1954. We do not agree to any of these contentions.

(2). As to the question of notice [which we first consider] we hold that ample notice was in fact given to appellant. This was evidenced in the order of June 2, 1954 and that of August 24, 1954, suspending the effective date of the rates in order that an investigation could be made. As indicated, appellant, initiated the present action for increased rates on May 27, 1954; and, it further appears that on August 20, 1954, one of the city intervenors, the City of Little Rock, filed its intervention which it denominated: "Petition for review of all prior orders establishing rate of return on plant investment," and asked the Commission to review all orders previously made by it as to percentage of earnings allowable on net plant investment. The Attorney General's intervention contained this prayer: "Wherefore, the intervenor prays that the foregoing matter be fully developed as to the Rate Base, Rate of Return and all other particulars in order that a fair and equitable rate may be established for all parties and classes of consumers concerned." As indicated, the Commission's order denying appellant's petition was not made until November 22, 1954.

(3). As to the testing period, it clearly appears to us from the record that the appellant, itself, in its Rate Application chose the testing period, and the Commission accepted Appellant's choice. Appellant's Application was tried throughout on the theory that the test period should be the 12 months ending March 31,

1954. In other words, March 31 was to be the cut-off period of this pattern year. As we read the record, the Commission, in effect, appears to have adopted the course of using a test period selected by appellant and based on appellant's most recent actual experience, and adjusted to known charges affecting operating costs and revenues in the immediate future. We, therefore, hold that appellant is not in position to question the test period.

THE RATE BASE. (1) It appears that the Commission determined the rate base to be $151,125,571 (Appendix i above) and the allowable rate thereon of 6% (or 5.985% or approximately 6%) amounting to $9,554,-737, as the annual allowable return. In establishing this rate base the commission refused to allow the average amount over the test period that the power company had invested in "Work Under Construction" (Account 100.3) and not revenue producing. We hold that there was substantial evidence to support the findings and conclusions reached by the Commission, under the broad powers granted to it, and that the Commission in its actions did not invade the company's constitutional rights. It was clearly the duty of the Commission, when the company sought an increase in rates, to determine whether the company was entitled to any increase in order to earn a fair return on its invested capital. It was not bound by its 1944 Order, and could make changes in it, on proper notice to appellant — which it did — just as long as, in so doing, it did not invade the constitutional rights of the power company. "Whenever there is filed with the Department by any public utility any schedule stating a new rate or rates, the Department may, either upon complaint or upon its own motion, upon reasonable notice, enter upon an investigation concerning the lawfulness of such rate or rates; . . . " [Section 18 (b) Act 324 of 1935, now § 73-217 b Ark. Stats. 1947].

In a well considered and reasoned case — from which we shall quote somewhat at length — where the situation was similar, in effect, to that on which our Commission acted here, the Supreme Court of Vermont in *Re Central Vermont Public Service Corp.*, 116 Va. 206,

71A 2d 576, 83 PUR NS 47, with reference to the duty and powers of a public service commission of that state to follow any certain formula in fixing rates, announced certain rules and principles of law applicable here. It was there said: "In the employment of its test-year basis the commission made no adjustment for the revenues which would be produced from the plant under construction when completed. Once it had been decided to eliminate plant under construction from the rate base [as here] the exclusion of revenues to be received therefrom automatically followed. Only so could it be determined whether the petitioners' earnings were adequate to provide a fair return on the property producing those earnings. Both property under construction and the estimated revenues therefrom must be included in the rate base, or neither." Here the commission included neither, which was proper. ". . . The inclusion of property under construction before the plant which it is designed to replace has actually been retired would obviously result in a double return . . . In the computation of the rate base, allowance is afforded the petitioner for capitalization of materials used in construction and inventories on hand before they were used in the process of construction . . .

"The issue here presented, that is, inclusion or exclusion of property under construction, is essentially one of fact for the commission's determination. The commission has found for exclusion, and no error appears.

"An administrative agency performing the delegated legislative function of rate making has a broad discretion. Mr. Justice Cardozo, speaking for the United States Supreme Court, said of it: 'Regulatory Commissions have been invested with broad powers within the sphere of duty assigned to them by law. Even in quasijudicial proceedings their informed and expert judgment exacts and receives a proper deference from courts when it has been reached with due submission to constitutional restraints . . . Indeed, much that they do within the realm of administrative discretion is exempt from supervision if those restraints have been obeyed.' *Ohio Bell Teleph. Co.* v. *Ohio Pub. Utilities Comm.* (1937) 301 U. S.

292, 304, 81 L. ed. 1093, 1101, 18 PUR NS 305, 313, 57 S Ct 724, 730. Such Commissions are not bound to the service of any single formula or combination of formulas. *Federal Power Commission* v. *Natural Gas Pipeline Co.* (1942) 315 US 575, 586, 86 L ed 1037, 1049, 1050, 42 PUR NS 129, 138, 62 S Ct 736, 743. In that case Mr. Chief Justice STONE said for the court: 'Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end.' "

Having concluded that our Commission here, has acted within its statutory authority, and that there was substantial evidence adduced to support its findings and order, we must and do affirm the judgment of the Pulaski Circuit Court.

Chief Justice SEAMSTER not participating, Justice McFADDIN dissenting in part.

ED. F. McFADDIN, Associate Justice (dissenting in part). There is only one point on which I dissent, but I consider that point to be of sufficient importance to require that the entire case be returned to the Public Service Commission to give further consideration to the matter of a rate increase in the light of this one point. It is this: in deciding that Arkansas Power & Light Company was not entitled to any rate increase, the Commission deliberately refused to consider an item of approximately Twenty Million Dollars which passed from "Construction Work in Progress" (Account No. 100.3) to "Plant Account" (Account No. 100) during the course of the hearings. I think the Commission should have considered this item in deciding a fair rate for the foreseeable future; it was duly called to the attention of the Commission and yet consideration was refused; and the result

was to fix a rate of return ignoring this item of approximately Twenty Million Dollars that was used and useful in the public service at the very time that the Commission made its order of November 22, 1954 in this case. So much for summary: now for the details.

In 1944 the then Department of Public Utilities—now the Public Service Commission[1]—had an extensive investigation into the affairs of the Arkansas Power & Light Company (hereinafter called "Power Company"). That hearing resulted in the order of 1944 adopting the "prudent investment rate base," and allowing the Power Company to earn 6% on the said rate base. The 1944 order also provided, *inter alia,* that the Power Company should file regular returns on prescribed forms and that if the net return of the Power Company at any time exceeded 6% on the said rate base, then said excess should be put into a special account to be held for disposition by the Commission. In the 1944 order, a rate base formula was adopted which allowed the Power Company to consider as used and useful in the public service all amounts shown in the "Construction Work in Progress Account," which was and is carried on the books of the Power Company as Account No. 100.3: that is, during the time any plant was in the course of construction, the Power Company was allowed to consider that account as a part of its prudent investment, even though it might be some time until the particular plant under construction actually went into use as serving the public. This Account No. 100.3, called "Construction Work in Progress Account," is one of the main issues in the present case, and must be constantly remembered.

The 1944 order—setting up the aforesaid formula—continued as satisfactory both to the Power Company and the Commission until May 27, 1954, when the Power Company filed the present application for rate increase,

---

[1] The Department of Public Utilities was the name of the administrative tribunal in 1944 (see Act No. 324 of 1935). By Act No. 40 of 1945, and later by Act No. 155 of 1951, the name was changed to the present name, "Public Service Commission," and the powers and duties of the old "Department of Public Utilities" were transferred to the present Public Service Commission. See § 73-101 et seq., Ark. Stats.

238

claiming that it was not earning 6% on its rate base as calculated under the 1944 order. To establish that it was not earning the 6% return, the Power Company selected the test year beginning April 1, 1953 and ending March 31, 1954. Since the application for rate increase was filed May 27, 1954, the year ending March 31, 1954 was as near to the filing date as bookkeeping methods permitted. This test year was selected by the Power Company, so March 31, 1954 was the "saw-off" date at the time the petition was filed.[2] After various interventions, pre-trial conferences, etc., the hearing finally got under way, and the Power Company established that on April 1, 1953, the beginning of the test year, it had in the Account No. 100.3 (Construction Work in Progress) the sum of $22,096,-692.00; and on March 31, 1954, the close of the test year, the Power Company had in the said Account $29,269,-798.00. The average of the opening and closing amount was $25,683,245.00, which, in round figures, I list at Twenty-five Million Dollars as the average of the "Construction Work in Progress Account" during the test year.

When the Commission found this amount in the Account No. 100.3 (Construction Work in Progress), the Commission decided that the Twenty-five Million Dollars represented an amount that was not then—on March 31, 1954—actually "used and useful in the public interest": rather, it was an amount of money then tied up in construction but not actually used by the Power Company in serving the public. The Commission, by its order of November 22, 1954 (here appealed from), held that the amount shown in Account No. 100.3 should not be considered in deciding a rate increase. In other words, the Commission changed the "prudent investment formula" prescribed in the 1944 order so as to eliminate from the rate base the amount in Account No. 100.3 on March 31, 1954. With such amount of Twenty-five Million Dollars eliminated, the Commission found that the Power Company was making approximately 6% on its rate base and,

[2] But months were spent in the course of the hearing, and the order of the Commission denying the Power Company a rate increase was dated November 22, 1954.

therefore, denied any increase. As aforesaid, this Account No. 100.3 (Construction Work in Progress) is the big issue in this case. There are many other issues,[3] but I direct my attention solely to this one issue because I consider it to be of sufficient magnitude to justify a reconsideration by the Commission.

The Power Company claims that the Commission had no right to change the "prudent investment formula" set up in the 1944 order, and that such change—the elimination of Account No. 100.3—is confiscatory, retroactive, void, etc. I see no merit in this argument of the Power Company. Any regulatory tribunal, like the Public Service Commission, can change the formula for determining the rate base at any time, so long at the formula adopted and put into existence prescribes a fair rate of return for the foreseeable future. In the case of *City of Ft. Smith* v. *Southwestern Bell Tele. Co.,* 220 Ark. 70, 247 S. W. 2d 474, there were mentioned several different methods for determining a rate base. The telephone rate was based on "net cost less depreciation." Other formulas or methods to determine the rate base were mentioned as "original cost" and "reproduction value"; and, here, the Power Company's rate base is on "prudent investment." In the case of *City of Ft. Smith* v. *Southwestern Bell Tele. Co., supra,* we said:

"From all of the cases and authorities which we have studied, we reach the conclusion that no public utility has a *vested right* to any particular method of valuation. The aim of a regulatory body is to determine a fair valuation; and the method of calculation may vary as between the type of the utility involved and the economic conditions existing."

No utility acquires a contractual right to any particular method of determining its rate base. The question is always: "What is a fair method to determine the rate base?" In its application of May 27, 1954, the Power Company said it was entitled to a rate increase and

---

[3] I am inclined to believe that the Commission was in error in refusing due consideration to an item of increased labor costs that occurred during the course of the hearing.

thereby asked the Commission to investigate the affairs of the Power Company. The power to investigate carries with it the power to change the previous method of determining the rate base. The only restrictions on the Commission in event of such change are (a) that the rate base selected be fair and reasonable in the light of business conditions; and (b) that it will yield a fair and reasonable return in the foreseeable future. So I see no merit in the Power Company's claim that the Commission had no power to change the rate base formula prescribed in the 1944 order.

But, when I consider what the Commission *did* in its order of November 22, 1954 about the Account No. 100.3 (Construction Work in Progress), I find myself in dissent from the majority opinion in the case at bar: the Commission refused to consider the fact that, within two months from March 31, 1954, approximately Twenty Million Dollars of the Twenty-five Million Dollars in Account No. 100.3 had passed from Construction Work in Progress into the Plant Account of the Power Company. In other words, during the course of the hearing before the Commission, it was definitely shown that approximately Twenty Million Dollars had passed to the stage of "used and useful in the public service"; yet the Commission refused to consider that matter of Twenty Million Dollars in deciding a rate base for the foreseeable future. I think the Commission acted arbitrarily in refusing to consider such fact before it when it made its order of November 22, 1954.

It must be borne in mind that months were spent by the Commission in examining and cross-examining the witnesses put on by the Power Company. Then, when the Power Company rested, the staff of the Public Service Commission moved that the petition for rate increase be dismissed because the staff of the Public Service Commission claimed that the Power Company had not shown itself entitled to any increase. Hearings were held all through August, 1954 and over into November, 1954; and in these hearings it was shown by the Power Company that, as of August 31, 1954, the balance in the Account

No. 100.3 (Construction Work in Progress) was only $4,856,306.00. Thus, from the average of $25,683,245.00 shown in the Account No. 100.3 for the test year, the sum of $20,826,939.00 had passed from the "Construction Work in Progress Account" to the "Plant Account" actually *used and useful in the public service.*[4] Thus, when the Commission made its order on November 22, 1954 (entirely eliminating the Account No. 100.3—Construction Work in Progress), the Commission had uncontradicted evidence before it which showed that more than Twenty Million Dollars—entirely excluded because it was "Construction Work in Progress" on March 31, 1954—had, by August 31, 1954, become "Plant Account," used and useful in the public service. Yet the Commission entirely refused, in its order of November 22, 1954, to allow the Company any return on the said Twenty Million Dollars that had become used and useful in the public service in the course of the hearing.

The Commission was not set up to determine whether a rate base was fair in the past, but to determine a rate base that would be fair in the foreseeable future; and when this Twenty Million Dollar item was not taken into consideration, I think the result reached by the Commission was arbitrary and approaches the borderline of confiscation. In *City of Ft. Smith* v. *Southwestern Bell Tele. Co.*, 220 Ark. 70, 247 S. W. 2d 474, in speaking on this point, we quoted from *McCardle* v. *Indianapolis Water Co.*, 272 U. S. 400, 71 L. Ed. 316, 47 S. Ct. 144, as follows:

" 'In every confiscation case, the future as well as the present must be regarded. It must be determined whether the rates complained of are yielding *and will yield,* over and above the amounts required to pay taxes and proper operating charges, a sum sufficient to constitute just compensation for the use of the property employed to furnish the service; that is, a reasonable rate of return on the value of the property at the time of the investigation *and for a reasonable time in the immediate future.* ' " And then we stated our own conclusions:

[4] Part of this was Lynch Unit No. 3 which was placed in operation on June 19, 1954; and Couch Unit No. 2 which was placed in operation on July 31, 1954; and part related to heavy transmission lines.

242

"We recognize that a utility rate must be reasonable and just as to the present, and also for a reasonable time in the future, and that the Commission may—in order to forestall subsequent applications for rate increase—allow a reasonable figure for anticipated extensions to be made in the future. But to anticipate reasonable future extensions is one thing, and quite another thing to select a future date after the closing of the evidence on which to base a factual finding as to value of property. We adhere to the view that in order to determine the actual plant, used and useful, on a certain date, there must be *proof,* as distinguished from mere *promises or predictions;* . . ."

In the case at bar the Power Company met the test by offering *actual proof,* because it showed that on August 31, 1954 more than Twenty Million Dollars had been passed from "Construction Work in Progress" to "Plant, used and useful in the public service"; and yet the Commission refused to consider any situation arising after March 31, 1954. Therein I think was the fatal error in this hearing.[5]

It is argued in the briefs that the Commission had the right to assume that the Twenty Million Dollars in new Plant would produce, enough additional revenue to afford a 6% net return on the Twenty Million Dollars. As far as I can find, there is no evidence from which the Commission could reach any such assumption. At all events, the Commission did not offer any such explanation in its order of November 22, 1954. In the 1944 order it was provided that the Power Company would make semi-annual returns and, if it ever earned more than 6%, such excess was to be put into a special account. With that provision facing the Commission, I can see no justification for the Commission's refusal to consider the

[5] If my views—as herein expressed—had prevailed and the cause had been remanded to the Commission to consider a rate schedule to include this Twenty Million Dollar item, then I would have voted that the Commission should exclude from the Account No. 100.3 (Construction Work in Progress) any amounts that represented *accrued interest* as distinct from actual cash invested. To allow *accrued interest* would be to allow the Power Company a rate of return on *"accrued items"* rather than *"actual investment items."* This is discussed by the Vermont Supreme Court in "Petition of Central Vermont Public Service Corp., 71 Atl. 2d 576."

approximately Twenty Million Dollars that passed from Construction Work in Progress to Plant, used and useful in the public service, during the course of this hearing. I seriously believe that the Commission's failure to consider the item justifies the Power Company's claim of arbitrariness and confiscation, unless this Court is now willing to say—and I am not—that, even considering the item, the rate of the return to the Power Company, though less than 6%, is still an adequate return. I am not willing to go that far in this case. The majority has not shown itself willing to go that far; and, therefore, I think this case should be returned to the Commission to consider a rate increase in the light of facts that occurred during the course of its hearing. It is entirely proper to consider a test year, but what the Supreme Court of Pennsylvania said in the case of *City of Pittsburgh* v. *Pa. Pub. Util. Com'n,* 171 Pa. 187, 90 Atl. 2d 607, is apropos to the situation here:

"We recognize the necessity, as a practical matter, for a cut-off date and the use of a base year in arriving at a final determination. But the Commission cannot be oblivious to recent figures in its own files supplied by the utility. . . . The Commission may not ignore recent information and evidence which substantially affect the problem before it. Allowance must, of course, be made for property additions to the rate base. . . . The Commission should also consider any further available material evidence on this question. As the Commission said in its present order: 'Equity requires that respondent's rates, being made for the future, should be predicated upon the latest tax conditions known.' "

For the reasons herein stated, I respectfully dissent.