ALLIED TELEPHONE CO. *v.* ARK. PUBLIC SERVICE COMM.

5-3540                                    393 S. W. 2d 206

Opinion delivered May 24, 1965.

[Rehearing denied September 20, 1965.]

H. *Clay Robinson* and *R. H. Thornton, Jr.*, for appellant.

*Harry E. McDermott, Jr., Donald K. King, Bill R. Holland, Hershel H. Friday, F. Mark Garlinghouse,* St. Louis, Mo., for appellee.

ED. F. McFADDIN, Associate Justice. The important question in this case is whether the appellant should be allowed to use a machine called "Telfast" for completing long distance calls to points in Arkansas served by Southwestern Bell Telephone Company. A minor question relates to an injunction.

The appellant, Allied Telephone Company (hereinafter called "Allied"), is an Arkansas corporation owning and operating telephone exchanges in the cities of Sheridan and Fordyce, as well as in several other cities in Arkansas. Southwestern Bell Telephone Company (hereinafter called "Southwestern") is a corporation (being a subsidiary or affiliate of American Telephone and Telegraph Company) operating telephone exchanges and long distance lines in Arkansas and several other states. The Bell system of American Telephone and Telegraph Company (of which Southwestern is a part) is nationwide, whereas Allied is one of several so-called independent companies operating in Arkansas.

In order that the subscribers of the independent telephone companies may complete long distance calls to points on the Southwestern system throughout Arkansas,[1] and in order that Southwestern subscribers in

---

[1] We are stating the case as an intrastate case so that the Arkansas Public Service Commission's order cannot be considered as infringing on the powers of the Federal Communications Commission (see Title 47 U.S.C.A.) ; but, of course, some of the calls from Allied subscribers would be to points outside Arkansas. In the brief for Southwestern it is stated that there are now more than 80 million telephones in the

other Arkansas cities may complete long distance calls to subscribers served by independent companies, there exists a so-called standard "Traffic Agreement" between Southwestern and the various independent companies specifying how long distance calls will be handled over the long distance lines of Southwestern throughout the State. Thus long distance calls are available from any point in the State to any telephone exchange having such Traffic Agreement with Southwestern. The present Traffic Agreement between Allied and Southwestern was signed on July 21, 1961, and was for one year and then automatically renewable until notice of termination should be given by either party. Two of the provisions in the Traffic Agreement are:

"V. TOLL OPERATING. The toll operating (ticking and timing) required hereunder shall be performed as may be agreed upon from time to time between the parties.

"VI. METHODS AND PRACTICES. With respect to all matters covered by this Agreement, each company will adopt and comply with standard Bell System operating methods and practices and will observe the rules and regulations of the lawfully established tariffs. Each company will, upon request, furnish to the other such information relating to the interchanged business covered herein as may reasonably be required."

There are at least three methods now in use for making and completing long distance calls:

(1) Call the operator[2] at a local exchange and place the long distance call to the place, number, and/or person desired; and the operator handles interchange and communications, and the person placing the call has only to wait until his desired number or person is reached. This is called the "Operator Method."

United States, and that there are 55 different telephone companies in Arkansas, and 2,800 different telephone companies in the entire United States.

[2] Back at the turn of the century the operator was called "Central."

(2) Use the method of "Distance Direct Dialing," whereby the person making a station to station call dials an area code, exchange number, and the number of the telephone at the destination desired. This is called the "DDD Method."

(3) Use the method known as "Person to Person Called Special" whereby the person making the long distance call may dial direct to the desired city but have an operator come on the line to control completion of the call and the billing of the charges either to the person called or to a credit card or to a third party number. This method is called "PPCS."

The foregoing three methods are now in operation in various exchanges; but the problem involved in this litigation arises because of a fourth method which Mr. Hugh R. Wilbourn, President of Allied, has invented and desires to use at the Allied telephone exchange in Sheridan, Arkansas. This fourth method for handling of long distance calls is called "Telephone Fully Automatic Switching and Ticketing," and is herein referred to as "Telfast." Below we copy the description of "Telfast" as contained in Allied's brief in this Court:

"Tape recording equipment is added to the existing automatic ticketing machines of a PPCS system. Station to station prepaid calls work like DDD and PPCS. The difference comes in sending other types of toll calls. To operate the equipment, the subscriber dials three digits: the first activates the machine, the second indicates the type of call that he wishes to make, and the third designates which station on a party line is making the call. Then the subscriber dials the area code (if the call is to another state), followed by seven digits of the desired number. Both the calling and called number are recorded in a computer, and the call is stored in the machine. At this point, the subscriber is connected with the tape recorder and a periodic beep tone commences. The tape recording tells the caller what type of call he has dialed and gives him instructions (e.g. for a credit card call, the recording might state, 'when you hear the bell, give

your credit card number'). After a certain period of time, up to twenty (20) seconds, the machine rings the called number. When a party answers at the called number, the subscriber, in a person to person call, asks for the desired person, or in a collect call, asks if the party will accept the charges. During this period the tape recorder is running to make sure that the correct party has reached the phone or that the charges will be accepted. When the desired party is reached, or charges are accepted, the calling party dials the digit 2 which disconnects the tape recorder (including the beep tone), and the call is timed and ticketed automatically. If, for any reason, a subscriber does not wish to use the Telfast equipment, e.g. if he wants time and charges, he may dial the digit '0', get the operator, and proceed to complete his call with operator assistance.''

There is no Telfast machine now in use in any telephone exchange in the United States. Mr. Wilbourn's invention of Telfast has been patented during the course of this litigation and the Kellogg Division of the International Telephone Telegraph Company is ready to manufacture and install a Telfast machine in Allied's exchange in Sheridan, Arkansas.

With the above background matters, we come to the present litigation. On June 14, 1963, Southwestern filed before the Arkansas Public Service Commission[3] a complaint against Allied regarding Telfast. The complaint alleged the traffic agreement between Allied and Southwestern; that Southwestern had been notified of Allied's intention to install a Telfast machine in the Sheridan exchange; ''that the use of such equipment would create numerous problems and have much a detrimental effect on long distance telephone service that Southwestern could not agree to Allied's proposal.'' The complaint also alleged:

''The use of the aforesaid ticketing equipment in the making of long distance calls will conflict with Bell

[3] For the applicable statutes in relation to the powers and duties of the Arkansas Public Service Commission, see Ark. Stat. Ann. § 73-201 et seq. (Repl. 1957), particularly § 73-218.

System standard practices and, therefore, violate the parties' Traffic Agreement. It will also cause damage, expense and financial loss to Southwestern, will adversely affect the quality of toll service furnished jointly by Allied and Southwestern, will lead to toll service abuses and will result in dissatisfaction, confusion and complaints on the part of Southwestern's customers and other telephone users in the State of Arkansas. The use of such equipment would unreasonably impair the ability of Southwestern and Allied to furnish reasonably safe, adequate and sufficient service to the telephone users in Arkansas and would be contrary to the public interest.''

The complaint detailed a number of results—all claimed to be detrimental to the long distance service—that it was claimed would flow from the use of Telfast by Allied in its Sheridan exchange; and the prayer of the complaint was that the Commission order Allied to refrain from the installation or use of Telfast. Allied resisted Southwestern's complaint, insisting that Allied had a managerial right to use the new and improved Telfast in its exchange; prayed that Southwestern's complaint be dismissed, and said:

''Allied is desirous of making available to its subscribers of all classes the best possible service which becomes available through technological advances in the science of telephony. Allied admits that one feature of the system being installed in Sheridan is technologically new, and like all new equipment can only be tested out in practice, as have been all of the technological advancements made in telephony; . . .''
Also Allied said:

''Allied proposes that a hearing on the merits of this controversy be delayed for six (6) months, during which time the Sheridan System can be given a trial run. During this period of time all dialings invoking the unique features of the system will be monitored by a human operator in Fordyce so that no possible fault in the system will result in harm to the subscribers or

to Southwestern. Allied considers that the facts which will become available through actual experience are necessary for a proper determination of all issues of customer service, and that actual experience in the operation will resolve all controversy with Southwestern with regard thereto."

Southwestern resisted the six months abeyance plea of Allied; the Arkansas Telephone Association and the City of Sheridan intervened on behalf of Allied; and the Commission proceeded to a full hearing on all issues. Various witnesses testified and a record of more than 700 pages is before us. On December 12, 1963, the Commission entered its order refusing to hold the case in abeyance for six months, ordering Allied to refrain from installing the Telfast machine in its Sheridan exchange for use in any calls over Southwestern's long distance lines, but permitting Allied to use the Telfast machine on its own lines.[4]

There was a Majority Opinion delivered by two of the Commissioners and a Dissenting Opinion by one Commissioner; and the Opinions demonstrate the care with which the Commission considered this cause. From the order of the Commission adverse to it, Allied proceeded in due channels through the Circuit Court, and the cause is now here before us and Allied has made three points, to-wit:

"I. The Commission exceeded its authority in prohibiting installation of adequate service equipment because of 'degradation.'

"II. The Commission exceeded its authority in prohibiting installation of Telfast because of an alleged breach of contract.

"III. The order is erroneous because it is arbitrary and capricious."

We will use our own topic headings in disposing of the issues.

---

[4] The order also contained provisions for an injunction against Allied for rerouting long distance calls; and that will be discussed in Topic III of this Opinion.

I. *Use Of Telfast On Long Distance Calls Over The Southwestern Lines.*

The Commission found:

"The Allied proposal would degrade the quality of long distance service, would breach the contract between Bell and Allied; and would, therefore, be adverse to the public interest."

Based on the above finding the Commission ordered:

"That Allied be, and it is hereby, ordered to cease and desist from installing the proposed system at Sheridan for the purpose of connecting it to Bell's facilities."

It is well to state again the extent of our review in a case like this one. In *Barnes v. Ark. Public Service Comm.,* 235 Ark. 683, 362 S. W. 2d 1, Mr. Justice Bohlinger quoted from an earlier case:

" 'It is well settled by our decisions that the Commission is clothed with broad legislative and administrative powers and that a review of its findings and order by either the circuit court or this court, on appeal, is considerably limited in its extent. Ark. Stats., Sec. 73-233 (d) provides that such review shall not be extended further than to determine whether the Commission has regularly pursued its authority, including a determination of whether the order under review violated any right of the complainant under the U. S. or State Constitutions. However this does not mean that the courts cannot inquire beyond mere formality when other provisions of the statute are considered along with Sec. 73-233, *supra.* In this connection we have repeatedly held that if the Commission's order is supported by substantial evidence, free from fraud, and not arbitrary, it is the duty of courts to permit it to stand, even though the courts might disagree with the wisdom of the order. *Department of Public Utilities v. Ark.-La. Gas Co.,* 200 Ark. 983, 142 S. W. 2d 213; *City of Fort Smith v. Southwestern Bell Telephone Co.,* 220 Ark. 70, 247 S. W. 2d 474; *Arkansas Power & Light Co. v. Arkansas Public Service Commission,* 226 Ark. 225, 289 S. W. 2d 668.' "

500

Witnesses for Southwestern testified that the use of Telfast by Allied at its Sheridan exchange would violate the provisions in the Traffic Agreement, as heretofore copied; would reduce revenue to Southwestern because of the holding of circuits in attempting to complete calls; and would degrade the quality of long distance service in the confusion and slowing of service. This latter was explained by these features:

(a) The person placing the call would be required to dial an increased number of digits;

(b) the presence of the "beep tone" would be an innovation;

(c) the person placing the call would directly inquire if the person called would accept the collect call, and this might be in language much longer than the regular operator would use; and

(d) then a new digit would be dialed or the line would be automatically disconnected after an interval.[5]

A reference back to the description of the Telfast Method clearly shows that the foregoing factors are present. Also it was shown that the telephone industry has spent large amounts of money and considerable time to educate the telephone using public as to Distance Direct Dialing; that PPCS has not yet gone into full service; and that larger amounts of money and much more time would be required before the telephone using public could efficiently use the Telfast system, which is as great a departure from the DDD as that method was from the Operator Method. Even the PPCS is not yet in general use, and Telfast contains additional factors not found

---

[5] Allied has abstracted the testimony of the witness Edward Kice, Jr. as to the loss of circuit time through use of Telfast: "In an average Arkansas town the relationship of uncharged time to total circuit time is 2.49 minutes to 5.92 minutes. In evaluating the Sheridan system, we knew a newly trained operator is 40% less effective than an experienced operator, and assumed the Sheridan customer would equal a newly trained operator. Since 55% of Sheridan calls would require that the customer perform some operating functions, the penalty will be 55% × 40% or about 20% inefficiency. I will make no adjustment for the 45% of calls which did require an operator, but will become completely automatic. This 20% applied to the ratio of 2.49 to 5.92 equals 7% of the circuit time."

in PPCS. Furthermore, witnesses testified that the use of Telfast by Allied in its Sheridan exchange would necessitate the expenditure by Southwestern of several thousand dollars in its Little Rock exchange. There were other matters in evidence, but we have detailed enough to show that the Commission's findings meet the tests set by our cases.

Allied says that the finding that Telfast would "degrade" long distance service is not the correct test. The applicable statute (Ark. Stat. Ann. § 73-218 [Repl. 1957]) gives the Public Service Commission the power to "Detemine the reasonable, safe, adequate, sufficient service to be observed, furnished, enforced, or employed by any public utility, and to fix the same by its order, rule, or regulation." The record before us shows that the present long distance service, without Telfast, complies with the requirements of the quoted statute. When the Commission found that the use of Telfast to complete long distance calls over Southwestern's lines would "degrade" the service, such was tantamount to a finding that the use of Telfast for such long distance calls would result in service that would be less than "reasonable, safe, adequate, sufficient," because the word "degrade" means (according to Webster) "to lower from a superior to an inferior level," or "to lower or impair in respect to some physical property," or "to damage."

We conclude that the order of the Public Service Commission—that Allied cease and desist from installing Telfast System for the purpose of connecting with Southwestern's long distance lines—is sustained by the. Commission's findings, which are likewise sustained by the evidence, and should be affirmed.

II. *Refusal To Allow The Six Months Trial Period Sought By Allied.* Allied moved that the Commission temporarily postpone any hearing and decision and allow Allied a period of six months to install the Telfast machine in the Sheridan exchange for use on all long distance calls over Southwestern lines. Allied claimed that the Commission would be able to determine from

actual experience the effect of Telfast, and offered to indemnify Southwestern for any loss or expense caused by such six months trial period if the Commission, on final hearing, found against Telfast.

The Commission postponed decision on this six months test period request until the final hearing in this cause, and then disallowed such trial period on Southwestern's long distance calls. The order of the Commission on this point is:

"That the motion of Allied to hold these proceedings in abeyance until the completion of a trial of the equipment and procedure, during a controlled test period, be, and it is hereby, overruled."

Allied insists that the Commission allowed Allied to use the Telfast machine on long distance calls on its own lines, thereby—as Allied claims—finding that Telfast was not "degrading" Allied's efficiency. Why then —insists Allied—should Telfast not be tried on Southwestern's system? The answer seems clear to us: one of the point made by Southwestern against the immediate use of Telfast on Southwestern's long distance lines was the amount of money and time that would be required to educate the telephone using public as to the new procedure required for Telfast. If Allied wants to undertake this educational effort among its own subscribers in its limited territory, it is free to do so; but the Commission found that it was not feasible to have this done all over the State at this time. The City of Sheridan intervened to support Allied, so evidently the City of Sheridan feels that the educational program on Telfast will not be too difficult for calls in that area; but just as "one swallow does not make the spring," so one Telfast machine in Arkansas does not require Southwestern to undertake a six months educational campaign for long distance telephone calls originating in Sheridan.

Progress is sometimes made by small independents, rather than by large corporations, and we sincerely hope that Telfast will prove to be a great forward advance in long distance telephone service. The mere fact that

Telfast is something new that Southwestern had not installed and the like of which the Bell Laboratories have never been able to perfect, is no justification for the objection of Southwestern to the use of Telfast by Allied on its own lines; but the amount of educational campaign and advertising that Southwestern and other companies would have to conduct over their entire systems in Arkansas to explain the use of Telfast is a good reason for the action of the Commission in denying Allied's request for a six months trial period. The order refusing the use of Telfast on Southwestern long distance calls is not *res judicata*. After Allied has used Telfast for a time for long distance calls on its own lines, and thereby demonstrated the efficiency of Telfast, Allied may see fit to ask the Commission for a new hearing as regards Telfast on Southwestern lines long distance calls. In such event, the entire issue will be tried anew without any plea of *res judicata* being available to Southwestern.

III. *The Injunction To Prevent Allied From Rerouting Long Distance Calls.* This issue is largely unrelated to the Telfast issue, but is in the same case. The Traffic Agreement signed by Allied and Southwestern on July 21, 1961, and previously discussed, provided that Allied's Sheridan exchange would be interconnected with the Southwestern facilities at Sheridan and served by Southwestern's Pine Bluff, Arkansas Toll Center. The complaint filed by Southwestern in this case alleged the foregoing Traffic Agreement and alleged that Allied was proposing to reroute all outgoing Sheridan long distance calls through Allied's Fordyce, Arkansas Toll Center, and proposed to use Southwestern's Sheridan-Pine Bluff facilities for incoming traffic only. Southwestern prayed that Allied be enjoined from such rerouting of its outgoing long distance calls, and claimed that such rerouting would be a violation of the Traffic Agreement between Southwestern and Allied. The Commission made this order:

"That Allied be, and it is hereby, ordered to cease and desist from rerouting Sheridan Long Distance traffic through Fordyce, and it is further ordered to main-

tain the present routing of such traffic during the existence of the present traffic agreement between Allied and Bell.''

While this is a minor issue in the case, we nevertheless conclude that the Commission acted beyond its jurisdiction in enjoining Alled from the breach of a contract on the broad terms as contained in the aforesaid copied order. Of course, if there had been a finding that such rerouting of calls would result in inadequate service to the telephone using public, then the Commission would have had jurisdiction, since, under Ark. Stat. Ann. § 73-218 (Repl. 1957), its duty is to see that service is adequate, etc. But there was no finding in this case that the mere rerouting of Sheridan long distance calls through Fordyce would result in any inadequate service; and the Commission is not the proper forum to enjoin a mere breach of contract.

In *Asso. Mechanical Contractors* v. *Ark. La. Gas Co.,* 225 Ark. 424, 283 S. W. 2d 123, there was a proceeding brought before the Arkansas Public Service Commission by the Associated Mechanical Contractors, seeking to enjoin and restrain Arkansas Louisiana Gas Company from selling and installing air-conditioning equipment in competition wth the Associated Mechanical Contractors. The Commission found that it had no jurisdiction in such a case, and we upheld the holding of the Commission to that effect. The cited case is ruling here. The mere fact that Allied may be about to breach its contract with Southwestern does not give the Commission jurisdiction to issue an injunction in the absence of any factual finding (and there is none to that effect in this record) that such breach of the contract would impair the service to the public. Southwestern must seek its remedy in the proper judicial tribunal regarding breach of the contract, rather than before an administrative agency. So we reverse that part of the Commission's order which enjoined Allied from rerouting Sheridan long distance traffic through Fordyce. To that extent only the order of the Commission was in error.

In all other respects the order of the Commission is affirmed.

Robinson & Holt, J. J., not participating.

Special Associate Justice Albert Graves votes for this opinion.

George Rose Smith, Johnson, J. J. and Special Associate Justice Robert Compton, dissent.

ROBERT C. COMPTON, Special Associate Justice, (dissenting).

I am unable to agree with the majority opinion and therefore respectfully dissent.

This appeal questions the jurisdiction and right of the Arkansas Public Service Commission to grant the relief sought by Appellee Southwestern Bell Telephone Company prohibiting Appellant Allied Telephone Company from connecting to Bell's facilities automatic long distance equipment conceived by Allied and called "Telfast."

A unique problem and likely a case of first impression is before us because a public utility regulatory body, upon complaint by one telephone company, has restricted another telephone company as to its proposed use of equipment chosen by management. Certainly the effects of such action by such a regulatory body, if lawful, will be far reaching.

Allied is an Arkansas corporation owning and operating telephone exchanges in towns and cities within the State, including Sheridan and Fordyce. Bell is a wholly owned subsidiary of American Telephone & Telegraph Company, which owns the lines carrying most of the long distance calls in the United States. Allied's exchanges are interconnected with Bell's lines.

Bell and Allied operate under contract, cancelable by either party on sixty-days' notice, the most recent being dated March 25, 1963. This contract sets forth the agreement between the two companies regarding Allied's

connections with Bell's lines, establishes points of connection, operating methods and procedures for the settlement of revenues derived from long distance calls.

In recent years Bell has developed and put into wide use "Direct Distance Dialing" (DDD) by which the customer dials a distant number without the assistance of an operator, the calling and the called number and the time length of the call being recorded in a computer. Another recent automation of long distance calls is referred to as "PPCS" meaning "person-to-person collect and special." With this equipment, a customer, in addition to directly dialing a distant number, may, in part, by dialing appropriate digits to activate the machine, call person-to-person, collect, etc., but such call is completed with some assistance from an operator.

In March, 1961, Allied, over the objections of Bell, installed such a PPCS system at its toll center in Fordyce. This was the first installation of this type of equipment in the United States. Allied then programmed the installation of another PPCS system in Sheridan and on January 26, 1962, the Arkansas Public Service Commission granted Allied a Certificate of Convenience and Necessity for the Sheridan PPCS system.

Subsequently, H. R. Wilburn, Jr., President and General Manager of Allied, himself conceived an improvement on the PPCS machine whereby a customer, if desiring to do so, could dial person-to-person, etc., entirely automatically and without any assistance from an operator. Allied presented its plans for such automatic machinery to the Kellogg Division of International Telephone and Telegraph Company and that company agreed to build the machine for Allied, the device being called "Telfast".

In May, 1962, Mr. Wilburn met with Bell personnel to explain the system to them. After a series of meetings, engineering studies and exchange of letters, Bell, by letter dated April 23, 1963, advised Allied that it would not agree to the connection with its lines of the Telfast system at Sheridan. Allied then informed Bell that it

would install Telfast at Sheridan and instead of routing its long distance traffic through Bell's lines to Pine Bluff, as provided by the contract, it would route Sheridan long distance traffic over its own lines to Fordyce, where Allied's first PPCS system had been installed in 1961.

On June 14, 1963, Bell filed an action before the Arkansas Public Service Commission praying that Allied be ordered to cease and desist from installing the Telfast system at Sheridan because (1) by installing the equipment Allied was breaching its contract with Bell, and (2) the installation of the equipment would be detrimental to the nationwide telephone system. Allied filed an answer and motion denying the Commission's jurisdiction to grant the relief sought and moved that any action be held in abeyance for six months so that the Telfast system could be subjected to monitored testing by the Public Service Commission.

Bell objected to Allied's motion to hold in abeyance. The City of Sheridan, Arkansas, intervened in behalf of allowing Allied to install Telfast for service to Sheridan citizens. The Arkansas Telephone Association intervened and asserted that any telephone company should have the right to test new facilities.

The Commission refused to hold Bell's complaint in abeyance and the matter proceeded to hearing. On December 12, 1963, by a two-to-one decision, the Commission entered its findings, conclusions and order. The findings of the Commission were based upon the assumption that the proposed Allied equipment will work properly from a mechanical standpoint. The Commission nevertheless concluded that it had jurisdiction over the parties and the subject matter and that ''the Allied proposal would *degrade* the quality of long distance service, would breach the contract between Bell and Allied; and would, therefore, be adverse to the public interest.'' The Commission then ordered Allied to cease and desist from installing the proposed system at Sheridan for the purposes of connecting it to Bell's facilities and to cease

and desist from re-routing Sheridan long distance traffic through Fordyce and to maintain the present routing pursuant to the agreement between Allied and Bell.

Following the filing of a vigorous and well-written dissent, the Commission entered a clarifying order stating that the order only prohibits Allied from connecting Telfast to Bell's facilities and specifically stated that such order does not interfere with Allied's right to test equipment on its own system.

Allied appealed to the Pulaski Circuit Court, which affirmed the Commission's order. Allied now appeals to this Court and for reversal of the Commission's order asserts:

(1) "The Commission exceeded its authority in prohibiting installation of automatic service equipment because of 'degradation' ";

(2) "The Commission exceeded its authority in prohibiting installation of Telfast because of an alleged breach of contract;"

(3) "The order is erroneous because it is arbitrary and capricious."

Bell and the Public Service Commission have filled Appellees' Briefs in support of the Commission's actions. As expressed in oral argument Bell takes the position that this is an attempt by a flea on the end of the tail of a dog to wag the dog, inasmuch as Allied's proposal would degrade the existing telephone system by destroying uniformity.

For the purposes of this opinion these points will be discussed under the headings of Authority and Arbitrariness.

## AUTHORITY

Although one of the two conclusions, reached by the Commission, is that the installation of Telfast "would breach the contract between Bell and Allied", there is no mention of the contract in the eleven findings of the Commission.

However, the facts concerning this contract are not in controversy. It was entered into by the parties on March 25, 1962, approximately nine months after Allied had written Bell confirming an earlier conference at which the installation of Telfast was discussed, and shortly after a meeting discussing the installation in greater detail. *Thus at the time this contract was made Bell had full knowledge of Allied's intention to install Telfast at Sheridan yet there are no provisions in that contract prohibiting such equipment.*

Thus it is clear that any anticipatory breach of the contract could not be due to the proposed use of Telfast but due to Allied's plans to route its Sheridan long distance traffic to Fordyce rather than Pine Bluff, but this proposed change in routing was only made when Bell refused to permit the connection at Sheridan.

In any event, the question of who breached the contract and the consequenses thereof is a question for a Court of Law and certainly not a determination that can properly be made by this state regulatory body.

The governmental powers of this state are divided among the legislative, executive and judicial, no one of which may exercise any powers belonging to one of the others. *Constitution of 1874, Article 4.* The judicial power of the state is vested in certain specified courts and this list does not include the public service commission. *Ibid,* Article 7, Section 1.

The Commission is an administrative agency and has no powers not specifically granted by the Legislature for the purpose of regulating public utilities. It is not a court and cannot exercise judicial powers. *City of Ft. Smith* v. *Department of Public Utiliites,* 195 Ark. 513, 113 S. W. 2d 100.

This is not to say that the Commission could not have authority over any controversy which also involved a breach of contract. An act by a public utility in breach of a contract with another utility could also be in violation of the utility's duty to the public within the statutory authority of the Commission. However, in such event,

the authority of the Commission would exist because the act would violate the statutory regulation governing the activity of the utility, not because of the breech of the contract.

That part of the Commission's order based upon its conclusion of "breach of contract" could well fail because there are no findings of fact to support that conclusion, but must fail because the Commission has no authority to decide such matter.

Having eliminated the Commission's authority to prohibit Allied's installation of Telfast because of any supposed breach of contract, did the Commission have authority to prohibit the installation because of "degradation"? If so, one utility has successfully used the police power of the state to prohibit the use of particular machinery by another utility.

Since Bell's complaint was based only upon breach of contract and the alleged detrimental effect on the nationwide telephone system, that part of the Commission's order concluding that the Allied proposal would "degrade the quality of long distance service" grants Bell's prayers on a ground not urged by Bell.

The reason for this is obvious. The Arkansas Public Service Commission has no jurisdiction over the nationwide telephone system, so the Commission could not base its order on the nationwide effect of Telfast. This is a field pre-empted by Congress and in that arena the states have no power to regulate. 47 USCA 151, *Oklahoma-Arkansas Telephone Company* v. *Southwestern Bell Telephone Company,* 45 F. 2d 995 (C.C.A., Ark. 1930), *Independent Theatre Owners* v. *Arkansas Public Service Commission,* 235 Ark. 668, 361 S. W. 2d 642.

The Commission does have authority to regulate public utilities within the state and under this authority to require utilities to furnish adequate facilities. In any utility there are different grades of service, e.g., the private telephone lines and the multiple party telephone lines. If the grade of service becomes so low that the service becomes inadequate, Commissions have authority

to require that adequate service be provided the public by the utility.

Here the Commission's order was not based on a conclusion that the installation of Telfast would result in inadequate service to the people of Arkansas, but rather that it would ''degrade the quality of long distance service.'' Yet, by its clarifying order, the Commission specifically stated that its order does not interfere with Allied's right to test this equipment within its own system.

In its tenth finding the Commission stated that it proceeded on the assumption that the equipment will work properly from a mechanical standpoint. In its clarifying order it expressly permitted Allied to test the equipment within its own system, yet it enjoined Allied from connecting Telfast to Bell's facilities. As shown, the Commission had no authority for this action on the ground of breach of contract. Likewise, the Commission's action is not authorized on the ground of degradation of quality.

When the Commission found that Telfast will work properly from a mechanical standpoint and then permitted Allied to test Telfast within its own system and actual effect was a determination of adequacy and the Commission exceeded its authority in prohibiting the connection of Telfast to Bell's lines.

To hold otherwise would result in the Commission's allowing Allied to furnish inadequate service to the public within Allied's system. The Commission is charged with the regulation of public utilities for the benefit of the consuming public. It cannot, with or without complaint, knowingly permit a utility to furnish inadequate service to any segment of the people of this state.

It cannot correctly be said that a finding that the use of Telfast would degrade service is tantamount to a finding of unreasonable, unsafe, inadequate or insufficient service. If the Commission actually found that the use of Telfast would result in inadequate service to the public it could have and would have so stated. This Court cannot re-phrase the findings of the Commission in order to sustain the Commission's unauthorized acts.

The Commission simply does not have authority to prohibit the use of particular equipment on the basis of degradation. Otherwise, the Commission could direct the type of vehicles, poles, lines, insulators, telephone instruments and personnel based solely upon its own conception of grades of quality.

Authority to regulate does not include authority to manage. If utility equipment functions mechanically and provides adequate and reasonable service to the public, a state regulatory body has no authority to overrule management's decision to put that equipment into use.

In *Banton* v. *Belt Line Ry. Corp.*, 268 U.S. 413, 45 S. Ct. 534, 537, 69 L. Ed. 1020, it is said:

"Broad as its power to regulate, the state does not enjoy the freedom of an owner. Appellees property is held in private ownership; and, subject to reasonable regulation in the public interest, the management and right to control the business policy of the company belong to its owners. * * *"

Certainly, there can be no question of the right of a utility to adopt new methods of furnishing service if those methods are reasonable. The Commission has no authority to substitute its judgment for the judgment of management when the choice is between two systems which provide reasonable and adequate service. *State of Missouri* v. *Public Service Commission of Missouri*, 262 U.S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 ALR 807.

## ARBITRARINESS

It is not often that an appellate court will construe the actions of the fact-finding administrative tribunal to be unreasonable, an abuse of authority or arbitrary and capricious. 2d Am. Jur. 2d. Administrative Law, Section 651. This Court has often stated that its judgment will not be substituted for that of the Commission and that an order of the Commission will not be disturbed if supported by substantial evidence. *City of Ft. Smith* v.

*Southwestern Bell Telephone Co.,* 220 Ark. 70, 247 S. W.
2d 474.

But this does not mean that this Court should sum-
marily affirm a Commission's act, even when based upon
substantial evidence, if that act exceeds the Commis-
sion's authority and is arbitrary and unreasonable.

The entire evidence relating to the effect of Telfast
is speculation. The cost to Allied, Bell and the public; the
nature and extent of confusion and customer education,
and the overall effect of change in uniformity are all
actually unknown. This is true because nobody really
knows and cannot know until the device is adequately
tested.

All Allied asks is an opportunity to submit the device
to an adequate test. It has already invested a substantial
sum in the development and manufacture of Telfast; its
management is convinced that it will be of benefit to the
public and Allied is willing to indemnify Bell against any
loss by reason of the connection of Telfast to Bell's lines.
Of course, a test confined to Allied's own small territory
would in reality be no test at all.

The principle that new ideas deserve to be tested by
customer acceptance or rejection is basic to the concept
of a free enterprise society. The Arkansas law clearly
reflects this principle in that the Commission is directed
(Ark. Stats. 73-201, 218) to prescribe reasonable regula-
tions for the examination and testing of the plant and
equipment or apparatus employed by any public utility
in performing any service to its customers.

In its finding no. 7, the Commission states that ''the
feature of Allied's proposal that is objected to as being
contrary to the public interest is the elimination of opera-
tor control over those types of long distance calls in
which, under the 'PPCS' system, the operator performs
an essential function.'' However, the record shows that
if a customer so desires he may merely dial the digit
''O'' and place his call in the present manner. Also,
Allied offers to have an operator on duty to furnish aid,
if needed, in the public's use of telfast.

The Commission also states that uniformity is a desirable quality in the nation's toll network, however, uniformity was not met by the Commission permitting Bell's installation of "DDD" equipment and its prior approval of the Allied "PPCS" system at Fordyce.

The Commission prohibited Allied from connecting Telfast to Bell's toll lines, yet permitted Allied to install Telfast within its own system which would, of course, result in non-uniformity. Each innovation in the telephone communications industry has resulted in non-uniformity until the proven contribution of that innovation and subsequent industry-wide adaption has resulted in the uniformity of its use.

Truly, necessity is the mother of invention and the building of a better mouse trap will carve a path to the door of the builder. The record in this case reveals that all parties recognize a need for fully automatic long distance equipment and, according to Bell's own witness, a need that Bell has been studying and working toward for some years.

Allied has now developed and had manufactured a machine designed to fill that need. It asks that the device be tested for six months, that such test be monitored by the Commission and Bell and offers to hold Bell harmless for any loss it may sustain. The Commission has denied Allied permission to connect Telfast to Bell's lines for such a test. That action effectively prevents Allied from adequately testing the device because such test confined to its own small system would be inconsequential.

A determination of the adequacy of Telfast as a fully automatic long distance device cannot be made unless and until it is put into use as a part of the telephone system. Allied has developed the device and its management has directed its installation at Sheridan. The City of Sheridan asks that Allied be permitted to install Telfast at Sheridan. The Arkansas Telephone Association asserts the right of telephone companies to test new facilities. Only Bell objects to the installation and connection with its lines. Under these facts and circumstances the action

of the Commission not only exceeded its authority but is also arbitrary and unreasonable.

This cause should be reversed and remanded to the Pulaski Circuit Court, to be remanded to Arkansas Public Service Commission with directions to permit Allied to install Telfast at Sheridan and connect it with Bell's lines for a six-months' test to be monitored by the Commission and Bell, Allied first to indemnify Bell against loss by reason of the connection of Telfast to Bell's lines.

Smith and Johnson, J. J., join in this dissent.